Case Number:24-005053-CI

Case 8:25-cv-00271-MSS-TGW    Document 1-1    Filed 02/03/25    Page 1 of 87 PageID 12

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT,
IN AND FOR PINELLAS COUNTY, FLORIDA

ROSS FREITAS,

      Plaintiff

v.

R.J. REYNOLDS TOBACCO COMPANY,
PHILIP MORRIS USA, INC., SANTA FE
NATURAL TOBACCO COMPANY, INC.,
REYNOLDS AMERICAN, INC.,  and
WALMART, INC.

      Defendants.

_____/

## **COMPLAINT AND DEMAND FOR JURY TRIAL**

COMES NOW the Plaintiff, Ross Freitas, by and through his undersigned counsel files this complaint for damages against the defendant as follows:

### **JURISDICTION, VENUE AND PARTIES**

1. This is an action which exceeds the minimum jurisdictional limits of this Court ($50,000.00), exclusive of interest and costs.

2. At all times material  and relevant to this action, Plaintiff, ROSS FREITAS, was a resident of Pinellas County, Florida, and sui juris.

3. Venue is proper in Pinellas County, Florida, since, the cause of action accrued in Pinellas County, Florida, and where one or more the Defendants work in, reside in, and/or have their corporate offices in Pinellas County, Florida. Pursuant to Florida Statutes § 47.011, § 47.051.

4. Defendants have, since before Ross Freitas began smoking cigarettes, continuously done business in the State of Florida; made contracts to be performed in whole or in part in the State; manufactured, tested, sold, offered for sale, supplied, and/or placed cigarettes in the

1

stream of commerce, or in the course of their business, materially participated with others in so doing; and performed such acts as were intended to and did result in the sale and distribution of cigarettes in the State from which all Defendants derived substantial revenue, directly or indirectly. All Defendants also caused injury by acts or omissions in the State and/or caused injury in the State by acts or omissions outside the State.

5. At all times relevant to this litigation, Ross Freitas (hereinafter "Plaintiff") was a citizen of the State of Florida and resident of Oldsmar, Florida.

6. Plaintiff is informed and believes and thereon alleges that at all times relevant herein, Defendant PHILIP MORRIS USA, Inc. (hereinafter "PHILIP MORRIS"), was a corporation authorized to do business within this jurisdiction of Pinellas County, Florida, and was duly organized, created, and existing under and by virtue of the laws of the State of Virginia with its principal place of business located in the State of Virginia. Defendant, PHILIP MORRIS, resides and/or conducts business in every county within the State of Florida and did so during all times relevant to this action.

7. Plaintiff is informed and believes and thereon alleges that at all times relevant herein, Defendant R.J. REYNOLDS TOBACCO COMPANY, Inc. (hereinafter "R.J. REYNOLDS"), was a corporation authorized to do business within this jurisdiction of Pinellas County, Florida, and was duly organized, created, and existing under and by virtue of the laws of the State of North Carolina with its principal place of business located in the State of North Carolina. Defendant, R.J. REYNOLDS, resides and/or conducts business in every county within the State of Florida and did so during all times relevant to this action.

8. R.J. REYNOLDS TOBACCO COMPANY is also the successor-by-merger to LORILLARD TOBACCO COMPANY (hereinafter "LORILLARD"), and is the successor-in-interest to the United States tobacco business of BROWN & WILLIAMSON TOBACCO

CORPORATION (n/k/a Brown & Williamson Holdings, Inc.) (hereinafter "BROWN & WILLIAMSON"), which is the successor-by-merger to the AMERICAN TOBACCO COMPANY (hereinafter "AMERICAN"). References above and below to "R.J. REYNOLDS" or the "Defendants" include R.J. REYNOLDS' predecessors such as LORILLARD, BROWN & WILLIAMSON, and AMERICAN, where the sense requires.

9. Plaintiff is informed and believes and thereon alleges that at all times relevant herein, Defendant SANTA FE NATURAL TOBACCO COMPANY, Inc. (hereinafter "SFNT"), was a corporation authorized to do business within this jurisdiction of Pinellas County, Florida, and was duly organized, created, and existing under and by virtue of the laws of the State of North Carolina with its principal place of business located in the State of North Carolina. Defendant, SFNT, resides and/or conducts business in every county within the State of Florida and did so during all times relevant to this action.

10. Plaintiff is informed and believes and thereon alleges that at all times relevant herein, Defendant REYNOLDS AMERICAN Inc. (hereinafter "RAI"), was a corporation authorized to do business within this jurisdiction of Pinellas County, Florida, and was duly organized, created, and existing under and by virtue of the laws of the State of North Carolina with its principal place of business located in the State of North Carolina. Defendant, SFNT, resides and/or conducts business in every county within the State of Florida and did so during all times relevant to this action. In approximately 2002, RAI acquired SFNT and SFNT became and remains an operating subsidiary of RAI.

   a. At all material times, RAI and R.J. Reynolds were intimately involved in the marketing, advertising, and overall business development of Natural American Spirit cigarettes. R.J. Reynolds played a central role in developing Natural American Spirit's advertising and approved all decisions made by SFNT with respect to the

3

marketing, design, and composition of Natural American Spirit cigarettes. RAI also exercises control over SFNT's corporate decision-making and controls the financial operations of SFNT, including SFNT's business initiatives and capital expenditures.

    b.  RAI maintains control over its subsidiaries, including SFNT: SFNT's employees are considered RAI's employees; board members between SFNT and RAI overlap; RAI controls pricing for its subsidiaries, including for SFNT; RAI owns its operating subsidiaries' executive offices and manufacturing facilities; RAI reports SFNT's financial statements in its SEC filings; and RAI requires SFNT to make capital investments to support other RAI brands such as VUSE.

    c.  R.J. Reynolds' employees consult with SFNT on, among other things, brand equity research studies, consumer perception studies, consumer concept studies, and direct mail advertising. Moreover, R.J. Reynolds' employees assist SFNT in managing SFNT's smoker database, which contains information about persons who purchase cigarettes designed, manufactured, sold, and/or distributed by SFNT.

11. Plaintiff is informed and believes and thereon alleges that at all times relevant herein, Defendant WALMART, INC., (hereinafter "WALMART")  was a corporation authorized to do business within this jurisdiction of Pinellas County, Florida, and was duly organized, created, and existing under and by virtue of the laws of the State of Delaware with its principal place of business located in the State of Arkansas. Defendant, WALMART, resides and/or conducts business in every county within the State of Florida and did so during all times relevant to this action, is a retailer of tobacco and cigarette products and is registered with the State of Florida as a licensed tobacco retailer, selling such items to the public including, the Plaintiff, Ross Freitas.

12. Plaintiff further alleges that Defendants, at all times material to this cause of action, through

4

their agents, employees, executives, and representatives, conducted, engaged in and carried

on a business venture of selling cigarettes in the State of Florida and/or maintained an office

or agency in this state and/or committed tortious acts within the State of Florida and

knowingly allowed the Plaintiff to be exposed to an unreasonably dangerous and addictive

product, to-wit: cigarettes and/or cigarette smoke.

FACTS COMMON TO ALL CLAIMS

13. Plaintiff, repeats and realleges each and every allegation set forth in the preceding

paragraphs, as it full set forth herein.

14. Ross Freitas was born in 1943 and began smoking cigarettes in his twenties.

15. Plaintiff, Ross Freitas, was diagnosed in approximately June 2022, with Chronic Obstructive

Pulmonary Disease (hereinafter "COPD"), suffered a heart attack in 2023. Mr. Freitas

developed these diseases as a result of smoking: Marlboro Lights brand cigarettes and

Natural American Spirit brand cigarettes, to which he was addicted smoking approximately

a pack per day and smoked continuously from approximately 1960s to the present.

16. At all times material, Marlboro Lights brand cigarettes were and are designed, manufactured

and sold by Defendant, PHILIP MORRIS USA, Inc.

17. At all times material, Natural American Spirit brand cigarettes were and are designed,

manufactured, marketed and sold by Defendants, SANTA FE NATURAL TOBACCO

COMPANY, Inc., which is a wholly owned subsidiary of REYNOLDS AMERICAN, Inc,

and R.J. REYNOLDS TOBACCO COMPANY, Inc.

18. Plaintiff, ROSS FREITAS, purchased and smoked Marlboro Lights, and Natural American

Spirit from WALMART in sufficient quantities to be a substantial contributing cause to his

COPD and heart attack.

19. At all times material, Defendants purposefully and intentionally designed cigarettes to be

5

highly addictive. Defendants added ingredients such as ammonia and diammonium-phospate to "free-base" nicotine and manipulated levels of nicotine and pH in smoke to make cigarettes more addictive, better tasting, and easier to inhale. Defendants also deliberately manipulated and/or added compounds in cigarettes such as arsenic, polonium-210, tar, methane, methanol, carbon monoxide, nitrosamines, butane, formaldehyde, carcinogens, and other deadly and poisonous compounds to cigarettes.

20. For over half a century, Defendants concealed the addictive and deadly nature of cigarettes from Plaintiff, the United States Government, and the American public by making knowingly false and misleading statements and by engaging in an over two-hundred and fifty-billion-dollar conspiracy.

21. Despite knowing internally, dating back to the 1950s, that cigarettes were deadly, addictive and caused death and disease, Defendants for over five decades, purposefully and intentionally, lied concealed information, and knowingly made false and misleading statements to the public, including Plaintiff, that cigarettes were allegedly not harmful.

22. Defendants failed to acknowledge or admit the truth until they were forced to do so as a result of litigation in the year 2000.

23. Plaintiff's injuries arouse out of the Defendants' acts and/or omissions which occurred inside and outside of the State of Florida.

24. At all times material to this action, Defendants, PHILIP MORRIS, R.J. REYNOLDS, SFNT, RAI and their predecessors in interest knew or should have known the following:

   a. Smoking cigarettes causes COPD, which includes emphysema and chronic bronchitis, laryngeal cancer, and lung cancer, including squamous cell carcinoma, small cell carcinoma, adenocarcinoma, and large cell carcinoma;

   b. Nicotine in cigarettes is addictive;

c.   Defendants placed cigarettes on the market that were defective and unreasonably dangerous;

d.   Defendants concealed or omitted material information not otherwise known or available, knowing that the material was false and misleading, or failed to disclose a material fact concerning the health effects or addictive nature of smoking cigarettes, or both;

e.   Defendants entered into an agreement to conceal or omit information regarding the health effects of cigarettes or their addictive nature with the intention that smokers and the public would rely on this information to their detriment;

f.   Defendants sold or supplied cigarettes that were defective;

g.   Defendants were negligent

h.   Continued and frequent use of cigarettes highly increases one's chances of becoming and remaining, addicted;

i.   Continued and frequent use of cigarettes highly increases one's chance of developing serious illness and death;

j.   It is extremely difficult to quit smoking;

k.   "Many, but not most people who would like to stop smoking are able to do so" (Concealed Document, 1982)

l.   "Defendants cannot defend continued smoking as "free choice" if the person is addicted: (Concealed Document 1980), but nevertheless did continue to defend smoking as a matter of "free choice";

m.   It is possible to develop safer cigarettes free of nicotine, carcinogens, and other deadly and poisonous compounds;

n.   "The thing [Defendants] sell most is nicotine" (Concealed Document 1980);

7

o.  Filtered, low tar, low nicotine, "light," "organic," and "all natural" cigarettes are more dangerous than "regular" cigarettes;

p.  "Cigarette[s] that do not deliver nicotine cannot satisfy the habituated smoker and would almost certainly fail" (Concealed Document 1966);

q.  "Without the nicotine, the cigarette market would collapse, and [Defendants] would all lose their jobs and their consulting fees" (Concealed Document 1977);

r.  "Carcinogens are found in practically every class of compounds in smoke" (Concealed Document 1961);

s.  "Cigarettes have certain unattractive side effects . . . they contribute to cardiovascular disorders." (Concealed Document 1963).

25. Internal documents from Philip Morris and R.J. Reynolds, as well as the internal documents of their co-conspirators, show that they knew for decades that nicotine is an addictive drug and that their cigarettes were a vehicle for the delivery of nicotine. Reports aimed at determining the "optimum nicotine/tar ratio" to produce "the most favorable physiological and behavioral responses" tied nicotine delivery directly to Philip Morris' market position. Further records show that the Defendants and other cigarette manufacturers knew that the user's primary motivation for smoking cigarettes was to obtain the effects of nicotine. Philip Morris' and R.J. Reynolds' research confirmed, and their internal communications acknowledged, that addiction can be intensified through adjustment and manipulation of the "attractive dosage forms" of nicotine in cigarettes and the method of nicotine delivery. Philip Morris, R.J. Reynolds, and other cigarette manufacturers used this information to manipulate the nicotine delivery of their cigarettes so as to initiate and maximize addiction in smokers such as Mr. Freitas.

26. Defendant's Tortious and unlawful conduct caused consumers, including ROSS FREITAS,

8

to suffer serious injuries, including COPD and heart attack.

27. Ross Freitas has undergone numerous treatments in an effort to treat his COPD and heart attack and halt its spread throughout his body, including hospitalization, and medication. Mr. Freitas's treatments have incurred significant expenses and rendered him unable to go about his normal daily activities. These treatments have taken an enormous physical and emotional toll on Mr. Freitas.

*Historical Allegations of Defendants Unlawful Conduct
Giving Rise to the Lawsuit*

28. Lung cancer, caused by cigarette smoking, has killed over 20 million Americans.

29. Lung cancer is a disease manufactured and created by the cigarette industry, including by Defendants herein.

30. Prior to 1900 lung cancer was virtually unknown as a cause of death in the United States.

31. By 1935, there were only an estimated 4,000 lung cancer deaths. By 1945, as a result of the rise of cigarette consumption, the number of deaths almost tripled.

32. Because of this phenomenon, scientists began conducting research and experiments regarding the link between cigarette smoke and lung cancer.

33. In addition to scientists, Defendants themselves began to conduct similar research. By February 2, 1953, Defendants had proof that cigarette smoking increased the risk of lung cancer. A previously secret and concealed document authored by Defendant R.J. REYNOLDS, states: "Studies of clinical data tend to confirm the relationship between heavy smoking and prolonged smoking and incidence of cancer of the lung."

34. Approximately six months later on December 21, 1953, Life Magazine and Reader's Digest published articles regarding a groundbreaking mouse-painting study, conducted by Drs. Wynder and Graham, which concluded that tar from cigarettes pained on the backs of mice

developed into cancer.

35. As a result of these articles and mounting public awareness regarding the link between cigarette smoking and lung cancer, Defendants grew fearful their customers would stop smoking, which would in turn bankrupt their companies.

36. Thus, in order to maximize profits, Defendants decided to intentionally band together to form a conspiracy which, for over half a century, was devoted to creating and spreading doubt regarding a disingenuous "open debate" about whether cigarettes were or were not harmful.

37. This conspiracy was formed in December of 1953 at the Plaza Hotel in New York City. Paul Hahn, president of American Tobacco, sent telegrams to presidents of the seven largest tobacco companies and one tobacco grower's organization, inviting them to meet at the Plaza Hotel.



38. Executives from every cigarette company except Liggett met at the Plaza Hotel on December 14, 1953. The executives discussed the following topics: (i) the negative publicity from the recent articles in the media, (ii) the need to hire a public relations firm, Hill & Knowlton, and (iii) the major threat to their corporations' economic future.

39. In an internal planning memorandum Hill & Knowlton assessed their cigarette clients' problems in the following manner:

> There is only one problem – confidence, and how to establish it; public assurance, and how to create it – in a perhaps long interim when scientific doubts must remain. And, most important, how to

10

free millions of Americans from the guilty fear that is going to arise
deep in their biological depths – regardless of any pooh-poohing
logic – every time they light a cigarette. No resort to mere logic ever
cured panic yet, whether on Madison Avenue, Main Street, or in a
psychologist's office. And no mere recitation of arguments pro, or
ignoring of arguments con, or careful balancing of the two together,
is going to deal with such fear now. That, gentlemen, is the nature of
the unexampled challenge to this office.

40. On December 28, 1953, Defendants again met at the Plaza Hotel, where they knowingly and purposefully agreed to form a fake "research committee" called the Tobacco Industry Research Committee ("TIRC") (Later renamed the Council for Tobacco Research ("CTR")). Paul Hahn, president of American Tobacco, was elected the temporary chairman of TIRC.

41. TIRC's *public* mission statement was to supposedly aid and assist with so-called "independent" research into cigarette use and health.

42. The formation and purpose of TIRC was announced on January 4, 1954, in a full-page advertisement called "A Frank Statement to Cigarette Smokers," published in 448 newspapers throughout the United States.

43. The Frank Statement was signed by the following domestic cigarette and tobacco product manufacturers, including Defendants herein, organizations of leaf tobacco growers, and tobacco warehouse associations that made up TIRC: American Tobacco by Paul Hahn, President; Brown and Williamson by Timothy Hartnett, President; Lorillard by Herbert Kent, Chairman; Defendant Philip Morris by O. Parker McComas, President; Defendant, R.J. Reynolds by Edward A. Darr, president; Benson & Hedges by Joseph Cullman, Jr., President; Bright Belt Warehouse Association by F.S. Royster, President; Burley Auction Warehouse Association by Albert Clay, President; Burley Tobacco Growers Cooperative Association by John Jones, President; Larus & Brother Company, Inc., by. W.T. Reed, Jr., President; Maryland Tobacco Growers Association by Samuel Linton, General Manager;

11

Stephano Brothers, Inc., by C.S. Stephano, Director of Research; Tobacco Associates, Inc. by J.B. Hutson, President; and United States Tobacco by J. Whitney Peterson, President.

44. In their Frank Statement to Cigarette Smokers, Defendants knowingly and intentionally misled Plaintiff, the public and the American government by disingenuously promising to "safeguard" the health of smokers, support allegedly "disinterested" research into smoking and health, and reveal to the public the results of their purported "objective" research.

45. A statement on April 14, 1954, by the TIRC in "A Scientific Perspective on the Cigarette Controversy" that its members had adopted "an interest in people's health as a basic responsibility, paramount to every other consideration in our business," and a promise on July 1, 1954, to share its research findings on smoking and disease with the public;

46. Statements and publications by Clarence Cook Little, spokesman for TIRC, to the effect that scientific evidence showing the dangers of cigarette smoking were "not proven" or were "merely statistical." These statements included, but were not limited to, statements made in *Atlantic* magazine in 1957, which were made with an intent to deceive the public into believing cigarette smoking was safe;

47. The Frank Statement set forth the industry's "open question" position that it would maintain for more than forty years – that cigarette smoking was not a proven cause of lung cancer; that cigarettes were not injurious to health; and that more research on smoking and health issues was needed. In the Frank Statement, the participating companies accepted "an interesting people's health as a basic responsibility, paramount to every other consideration in our business" and pledged "aid and assistance to the research effort into all phases of tobacco use and health." The companies promised that they would fulfill the obligations they had undertaken in the Frank Statement by funding independent research through TIRC, free from any industry influence. The "Frank Statement" in its entirety stated as follows:

RECENT REPORTS on experiments with mice have given wide publicity to a theory that cigarette smoking is in some way linked with lung cancer in human beings.

Although conducted by doctors of professional standing, these experiments are not regarded as conclusive in the field of cancer research. However, we do not believe that any serious medical research, even though its results are inconclusive should be disregarded or lightly dismissed. At the same time, we feel it is in the public interest to call attention to the fact that eminent doctors and research scientists have publicly questioned the claimed significance of these experiments.

Distinguished authorities point out: 1. That medical research of recent years indicates many possible causes of lung cancer. 2. That there is no agreement among the authorities regarding what the cause is. 3. That there is no proof that cigarette smoking is one of the causes. 4. That statistics purporting to link cigarette smoking with the disease could apply with equal force to any one of many other aspects of modern life. Indeed the validity of the statistics themselves is questioned by numerous scientists.

We accept an interest in people's health as a basic responsibility, paramount to every other consideration in our business.

We believe the products we make are not injurious to health.

We always have and always will cooperate closely with those whose task it is to safeguard the public health.

For more than 300 years tobacco has given solace, relaxation, and enjoyment to mankind. At one time or another during these years critics have held it responsible for practically every disease of the human body. One by one these charges have been abandoned for lack of evidence.

Regardless of the record of the past, the fact that cigarette smoking today should even be suspected as a cause of disease is a matter of deep concern to us.

Many people have asked us what are we going to do to meet the public's concern aroused by the recent reports. Here is the answer: 1. We are pledging aid and assistance to the research effort into all phases of tobacco use and health. This joint financial aid will of course be in addition to what is already being contributed by individual companies. 2. For this purpose we are establishing a joint industry group consisting initially of the undersigned. This group will be known as TOBACCO INDUSTRY RESEARCH COMMITTEE ["TIRC"]. 3

In charge of the research activities of the Committee will be a scientist of unimpeachable integrity and national repute. In addition there will be an Advisory Board of scientists disinterested in the cigarette industry. A group of distinguished men [sic] from medicine, science, and education will be invited to serve on this Board. These scientists will advise the Committee on its research activities.

This statement is being issued because we believe the people are entitled to know where we stand on this matter and what we intend to do about it.

48. The issuance of the "Frank Statement to Cigarette Smokers" was an effective public relations step. By falsely promising the public the industry was absolutely committed to its good health, the Frank Statement allayed the public's concerns about smoking and health, reassured smokers, and provided them with a misleading and false effective rationale for continuing to smoke.

49. The Frank Statement was but the first of hundreds, if not thousands, of statements reassuring the public of the safety of cigarette smoking. The industry would push the "open question" as far as the late 1990s.

50. For the next five decades, TIRC/CTR worked diligently, and quite successfully, to rebuff the public's concern about the dangers of cigarettes. Defendants, through TIRC/CTR, invented the false and misleading notion that there was an "open question" regarding cigarette smoking and health. They appeared on television and radio to broadcast this message.

51. TIRC/CTR hired fake scientists and spokespeople to attack genuine, legitimate scientific studies. Virtually none of the so-called "research" funded by TIRC/CTR centered on the immediate questions relating to carcinogenesis and tobacco. Rather than addressing the compounds and carcinogens in cigarette smoke and their hazardous effect on the human body, TIRC/CTR instead directed its resources to alternative theories of the origins of cancer, centering on genetic factors and environmental risks.

52. A December 16, 1957, press release from TIRC falsely stating that "[n]o substance has been found in tobacco smoke known to cause cancer in human beings";

53. The major initiative of TIRC/CTR, through their Scientific Advisory Board (SAB), was to "create the appearance of [Defendants] devoting substantial resources to the problem without the risk of funding further 'contrary evidence.'"

54. "Research Reports on Tobacco and Health," generated on behalf of the co-conspirators by the Tobacco Institute and published for many years, which falsely claimed that there was scientific doubt concerning the known health consequences of smoking. These releases reported on fringe medical theories of causes of cancer other than cigarettes, in order to assuage the public's fear regarding the deadly consequences of smoking cigarettes. These theories, as reported by the Tobacco Institute on behalf of Philip Morris, R.J. Reynolds, and their co-conspirators included, but were not limited to, that smoking lowers fatty substances in the lungs, that lung cancer is caused by a certain personality, and that emphysema is an outcome of childhood measles;

55. The commentary in the Annual Reports put out by TIRC that uniformly challenged the hypothesis that smoking was linked to lung cancer and emphasized that data regarding smoking and health was controversial, contradictory, and inconclusive;

56. A false statement on July 6, 1961, by Tobacco Institute President George Allen in a press release that "The tobacco industry itself is more interested than anyone else in finding out and making public the true facts about tobacco and health," and a further false statement that "research in recent years has produced findings that weaken rather than support the claim that smoking is a major contributor to lung cancer";

57. TIRC/CTR's efforts worked brilliantly and cigarette consumption rapidly increased.

58. In 1962, The Tobacco Institute, the public relations successor to the TIRC, began to publish

many advertisements, including one entitled, "Some frank words about Smoking and Research," which stated in part:

> "Most scientists recognized long ago that there are no simple, easy answers in cancer research. They know that the answers to fundamental questions about causation can come only through persistent scientific research."
> The tobacco industry supports and cooperates with all responsible efforts to find the facts and bring them to the public."
>
> "In that spirit, we are cooperating with the U.S. Surgeon General and his special study group appointed to evaluate presently available research knowledge. Similar cooperation has been offered to the American Medical Association's proposed study."
>
> "*We know we have a special responsibility to help scientists determine the facts about tobacco use and health.*"
>
> "*The industry accepted this responsibility in 1954 by establishing the Tobacco Industry Research Committee* to provide research grants to scientists in recognized research institutions. This research program is continuing on an expanded and intensified scale."

59. On March 14, 1963, by Tobacco Institute President George Allen in a press release that "Scientific opinions differ widely. Many scientists say that more must be learned before it will be known whether any of the factors now under study, including smoking, has a role in causation of diseases such as lung cancer, and, if so, whether that role is direct or indirect, primary or incidental. In the opinion of these scientists, singling out tobacco as a major factor is not warranted by scientific knowledge";

60. An internal memorandum dated January 29, 1964, from George Weissman (Vice President of Philip Morris) to Joseph Cullman 3rd (President of Philip Morris and on the executive committee of the Tobacco Institute) regarding the "Surgeon General's Report" wherein it states "we must in the near future provide some answers which will give smokers a psychological crutch and a self-rationale to continue smoking";

61. An internal review of the Surgeon General's Report of 1964 by Helmut Wakeham, Vice

President of Research and Development at Philip Morris, Inc., concluding that there was "little basis for disputing the findings [of the 1964 Surgeon General's Report] at this time";

62. A confidential British American Tobacco document reporting on the company's 1964 visit with the heads of the major American tobacco companies, including Philip Morris and R.J. Reynolds, recounting the following concerning the influence of the lawyers in the conspiracy: "In consequence of the importance of the lawsuits, the main power in the smoking and health situation undoubtedly rests with the lawyers, and more particularly with the Policy Committee of lawyers. The members of this committee are – Henry Ramm (Reynolds Chairman) - Cy. Hetsko (A.T.Co.) - Add. Yeaman (Brown & Williamson) – Paul Smith (PM)[…]." The report concluded: "This Committee is extremely powerful; it determines the high policy of the industry on all smoking and health matters- research and public relations matters, for example, as well as legal matters- and it reports directly to the Presidents.";

63. In 1964, there was another dip in the consumption of cigarettes when the United States Surgeon General reported that "cigarette smoking is causally related to lung cancer in men … the data for women, though less extensive, points in the same direction."

64. The cigarette industry's public response, through TIRC, to the 1964 Surgeon General Report was to

 

17

falsely assure the public that (i) cigarettes were not injurious to health, (ii) the industry would cooperate with the Surgeon General, (iii) "more research" was needed, despite the industry's own internal decision not to conduct research directly related to tobacco and health, and (iv) if there were any bad elements discovered in cigarettes, the cigarette manufacturers would remove those elements. As a result, cigarette consumption again began to rise.

65. Despite Defendants' *public* response, internally they were fully aware of the magnitude and depth of lies and deception they were promulgating. They knew and understood they were making fake, misleading promises that would never come to fruition. Their own internal records reveal that they knew, even back in 1964, that cigarettes were not only hazardous, but deadly:

"Cigarettes have certain unattractive side effects… they cause lung cancer, they contribute to cardiovascular disorders." (Concealed Document 1963).

Carcinogens are found in practically every class of compounds in smoke" (Concealed Document 1961).

"The amount of evidence accumulated to indict cigarette smoke as health hazard is overwhelming. The evidence challenging such indictment is scant" (Concealed Document 1962).

66. Furthermore, not only did Defendants know and appreciate the dangers of cigarettes, but they were also intentionally manipulating ingredients, such as nicotine, in cigarettes to make them more addictive. Their documents reveal they knew the following:

"Our industry is based upon design, manufacture and sale of attractive dosage forms of nicotine" (Concealed Document 1972).

"We can regulate, fairly precisely, the nicotine … to almost any desired level management might require" (Concealed Document

1963).

Cigarette[s] that do not deliver nicotine cannot satisfy the habituated smoker and would almost certainly fail" (Concealed Document 1966).

"Nicotine is addictive … We are then, in the business of selling nicotine, an addictive drug" (Concealed Document 1963)

"We have deliberately played down the role of nicotine" (Concealed Document 1972).

"Very few consumers are aware of the effects of nicotine, i.e. its addictive nature and that nicotine is a poison" (Concealed Document 1978).

"Determine minimum nicotine required to keep normal smoker 'hooked'" (Concealed Document 1965).

"The thing we sell most is nicotine" (Concealed Document 1980).

"Without the nicotine, the cigarette market would collapse, and Defendants would all lose their jobs and their consulting fees" (Concealed Document 1977).

67. Defendants deliberately added chemicals such as urea, ammonia, diammonium-phosphate, and other chemicals to their cigarettes. They deliberately designed cigarettes to "free-base" nicotine and manipulated levels of pH in smoke to make cigarettes more addictive and easier to inhale.

68. Natural American Cigarettes may be more harmful than other cigarette brands because, on average, they deliver more free-base nicotine – which makes them on average least as addictive as other cigarettes – and certain carcinogenic compounds than most other cigarettes.

69. Defendants' sole priority was to make as much money as quickly as possible, with no concern about the safety or well-being of their customers.

70. In 1966, the United States Government mandated that a "Caution" label be placed on packs

of cigarettes stating, "Cigarette smoking may be Hazardous to Your Health."

71. The cigarette industry responded to the "Caution" label by continuing their massive public relations campaign, continuing to spread doubt and confusion, and continuing to deceive the public.

72. A public statement issued by the Tobacco Institute on October 21, 1966, two years after issuance of the 1964 Surgeon General's Report, stating that the tobacco industry knew "of no valid scientific evidence demonstrating that either 'tar' or nicotine is responsible for any human illness";

73. Also in in 1966, the Tobacco Institute ("TI") issued a press release where it stated on behalf of the industry falsely assuming the public the following:

> "Scientists through the world are continuing to investigate to learn the full facts about 'tar' and nicotine, and about questions concerning tobacco and health. *The tobacco industry is supporting much of this research and will continue to do so."*

74. A statement on October 3, 1967, by Paul D. Smith, Vice President and General Counsel of Philip Morris, that "The truth of the matter is this: No one knows whether cigarette smoking causes any human disease or in any way impairs human health," and that "[n]obody has yet been able to find any ingredient as found in tobacco or smoke that causes human disease";

75. In November 1967, at the direction of outside lawyers, the Tiderock Corporation, the Tobacco Institute's public relations firm, prepared an action plan titled "The Cigarette Controversy." The action plan proposed to influence public opinion by creating specific initiatives to re-open the "open question" cigarette controversy. The program called for the creation of a position paper for intra-industry use as well as one for distribution to the media and public. The plan included targeted categories for mailings such as the medical profession, scientists, communicators (press, radio, television), educators, top public figures, and 10,000 top corporate presidents. It also detailed the publication of magazine articles;

76. A memorandum dated April 15, 1968, from William Kloepfer, Vice President of Public Relations for the Tobacco Institute to Earle Clements, President of the Tobacco Institute stating, "Our basic position in the cigarette controversy is subject to the charge, and maybe subject to a finding, that we are making false or misleading statements to promote the sale of cigarettes";

77. The publication of an article in 1968, paid for by co-conspirators, entitled "To Smoke or Not to Smoke – That is Still the Question," in True magazine, which was designed to appear as legitimate article by a genuine author. The article was in fact written by a sportswriter who was also employed by Hill and Knowlton, the public relations firm behind the creation of TIRC. This article deliberately misstated the known dangers of smoking;

78. Notification by Philip Morris Senior Scientist Dr. Helmut Wakeham to Philip Morris senior management on January 10, 1969, that "[n]ow we have a study of the effect of smoking in pregnancy which supports previous conclusions that smoking mothers produce smaller babies," and that the medical field recognized that "smaller babies suffer detrimental effects all through life," including "lower intelligence test scores at age 10";

79. A 1969 Brown & Williamson internal document which states "doubt is our product since it is the best means of competing with the "body of facts" that exists in the mind of the general public. It is also the means of establishing a controversy.";

80. A report on December 8, 1970, by Philip Morris researcher Dr. Helmut Wakeham to Philip Morris President Joseph Cullman III on the Council for Tobacco Research program, which was publicly described as a funding source for independent research on tobacco and health, stating: "It has been stated that CTR is a program to find out 'the truth about smoking and health.' What is truth to one is false to another. CTR and the Industry have publicly and frequently denied what others find as 'truth.' Let's face it. We are interested in evidence

21

which we believe denies the allegation that cigarette smoking causes disease.";

81. A false statement on January 3, 1971, by Joseph Cullman III, President of Philip Morris that "We do not believe that cigarettes are hazardous; we don't accept that. But we are working with the government, working very hard with the government, on various methods of ascertaining whether or not cigarettes can be found to be hazardous … I believe they have not been proved to be unsafe";

82. A false statement on January 3, 1971, by Joseph Cullman III, President of Philip Morris that "[I]t's true that babies born to women who smoke are smaller, but they are just as healthy as the babies born to women who do not smoke. Some women would prefer to have smaller babies";

83. A press release dated November 15, 1971, in which the Tobacco Institute falsely stated, in addressing whether smoking adversely affects the health of pregnant women, that "We just don't know, and only further research on smoking and all the other possible factors that may affect pregnancy will answer the question";

84. An internal memorandum dated April 14, 1972, from Claude Teague (Assistant Director of Research for R.J. Reynolds) that states "happily for the tobacco industry, nicotine is both habituating and unique its variety of physiological actions, hence no other active material or combination of materials provides equivalent "satisfaction." The memo goes on to state that "we have deliberately played down the role of nicotine, hence the non-smoker has little or no knowledge of what satisfactions it may offer him, and no desire to try it. Instead, we must convince him with wholly irrational reasons that he should try smoking, in the hope that he will for himself then discovery the real "satisfactions" obtainable.";

85. A 1972 memorandum to Horace Kornegay, president of the Tobacco Institute, stated that for 20 years the industry had employed a single strategy to defend itself on three major fronts:

22

litigation, politics, and public opinion. The author noted that "it has always been a holding strategy, consisting of "creating doubt about the health charge without actually denying it - - advocating the public's right to smoke, without actually urging them to take up the practice--encouraging objective scientific research as the only way to resolve the question of health hazard.";

86. An updated version of the Tobacco Institute's "The Cigarette Controversy," published in 1974, stating that a causal relationship between smokers and illness or death had not been established and that such claims were unproven;

87. A 1976 interview of James Bowling, Vice President of Philip Morris, wherein he stated "I wouldn't be in the business if I thought cigarettes were harmful to people. I think it is important that there be a lot of us around who are trying to keep the research honest and open. I think the real dishonesty is telling people things that are not so."

88. A 1976 interview of Helmut Wakeham, Vice President of Science and Technology at Philip Morris wherein he stated "If the company, as a whole, believed that cigarettes were really harmful, we would not be in the business. We are a very moralistic company. I think the management of Philip Morris is sincere in this position. I think there is a great deal of doubt as to whether or not cigarettes are harmful."

89. Throughout this period, Defendants also introduced "filtered" cigarettes – cigarettes falsely marketed, advertised , and promoted as delivering and/or containing "less tar" and "less nicotine."

90. However, internally, in Defendants' previously concealed, hidden documents, the true nature of filtered cigarettes was revealed – filtered cigarettes were just as harmful, dangerous, and hazardous as unfiltered cigarettes; in fact, they were more dangerous. In previously secret document from 1976, Ernie Pepples from Brown & Willson states, "the smoker of a filter

cigarette was getting as much or more nicotine and tar as he would have gotten from a regular cigarette."

91. A pamphlet issued in 1978 by the Tobacco Institute, stating that "The flat assertion that smoking causes lung cancer and heart disease and that the case is proved is not supported by many of the world's leading scientists.";

92. Articles in *The Tobacco Observer*, circulated by the Tobacco Institute, perpetuating the industry's denials of causation and harm from smoking. One headline announced, "Smoke not harmful to average non-smoker" (October 1978). In the May 1976 issue, one headline read "No Simple Answers; Research Disputes UPI"; and another stated, "no cause and effect relationship between cigarette smoking and pulmonary emphysema has been established";

93. A November 1978 CTR memorandum acknowledged the existence of an "ad hoc" committee, made up of representatives of legal, public relations, and research executives of the major tobacco companies, who were working together to plan the industry's response to the "smoking and health" issue. This same memorandum noted that trade organizations such as CTR have been used as a tobacco industry "shield" in response to increasing reports of smoking related disease since the 1950s.

94. A pamphlet published by the Tobacco Institute in 1979 titled "TOBACCO from seed to smoke amid controversy," stating falsely: "it has not been established that smoking causes any human disease."

95. Defendants continued throughout the 1970s, 1980s and 1990s to encourage the false impression that there was a genuine and continuing controversy regarding the health hazards of smoking.

96. The tobacco industry frequently attacked the Surgeon General. For example, the industry preempted the Surgeon General's 1979 report on national news networks, stating the report

24

was "suspect from the start." The industry later attacked the Surgeon General following the 1988 report on the addictive nature of cigarettes with a press release titled, "CLAIMS THAT CIGARETTES ARE ADDICTIVE CONTRADICT COMMON SENSE."

97. William L. Dunn, a Philip Morris scientist, wrote in a 1980 document titled "The Nicotine Receptor Program" that, despite the fact that the psychopharmacology of nicotine is "where the action is for those doing fundamental research on smoking," and where "most likely will come significant scientific developments profoundly influencing the industry, . . . it is where our attorneys least want us to be."

98. A false statement by R.J. Reynolds Chairman and CEO Edward Horrigan in 1982 that "science to date after much research including over $100 million funded by our industry, indicates that no causal link [between smoking and human disease] has been shown," and that "there is absolutely no proof that cigarettes are addictive."

99. A national advertising campaign undertaken by R. J. Reynolds in 1984, which asserted that "[S]tudies which conclude that smoking causes disease have regularly ignored significant evidence to the contrary."

100.   In 1984 R.J. Reynolds Chairman and CEO Edward Horrigan, as part of a panel discussion on the "Nightline" television program, stated that: (1) "It is not known whether cigarettes cause cancer,"; (2) "Despite all the research to date, there has been no causal link established [between smoking and emphysema]"; and (3) "As a matter of fact, there are studies that while we are accused of being associated with heart disease, there have been studies conducted over 10 years that would say, again, that science is still puzzled over these forces.".

101.   A December 31, 1985, memorandum from Reynolds' outside counsel indicated that "[a]fter the 1964 Surgeon General's report came out, the Law Department influenced

research objectives to a degree, because the lawyers did not want anyone performing research that would appear to acknowledge that cigarettes or cigarette smoke contained harmful constituents or posed a health problem."

102.    A 1985 publication issued by R.J. Reynolds, entitled "Of Cigarettes and Science, falsely stating that cigarettes do not cause heart disease, which was the subject of an F.T.C. charge of false advertising.

103.    In 1994 the Tobacco industry released the previously confidential list of 600 cigarette additives, making it easier to believe that the true horror of cigarettes lay in their myriad additives.  Adults in the United States believe commonly that cigarette additives are primarily responsible for cigarettes' harmful aspects, and that natural or additive-free cigarettes are or may be less harmful than other brands.

104.    Throughout the 1960s, 1970s, 1980s and 1990s, the cigarette industry, including Defendants herein, spent two hundred and fifty billion dollars on marketing efforts to promote the sale of cigarettes.

105.    The cigarette industry spent more money on marketing and advertising cigarettes in one day than the public health community spent in one year.

106.    The Tobacco Institute issued publications and news releases, made telephone calls, and contacted the media, government, and others suggesting the presentation of the "other side" of the "health controversy" about cigarettes, and urged the media to quote tobacco industry sources when reporting on scientific developments showing the dangers of cigarettes smoking. These suggestions were accompanied by references to the amount of advertising carried in the magazine or newspaper and threats that such advertising would be dropped if the magazine did not comply.

107.    Cigarette smoking was glamorized – celebrities smoked, athletes smoked, doctors

smoked, politicians smoked everyone smoked.

108.    As early as the 1920s, and continuing today, cigarette manufacturers, including

Defendants herein, were also intentionally targeting children. Their documents reveal:

"School days are here. And that means BIG TOBACCO BUSINESS
for somebody … line up the most popular students" (Concealed
Document 1927).

SUMMER SCHOOL IS STARTING … lining up these students …
as consumers" (Concealed Document 1928).

"Today's teenager is tomorrow's potential regular customer"
(Concealed Document 1981).

"The 14-24 age group… represent tomorrow's cigarette business"
(Concealed Document 1974).

109.    Cigarette manufacturers, including Defendants herein, also targeted and preyed upon

minority populations in an effort to increase their market share and ultimately their profits.

110.    Cigarettes were the number one most heavily advertised product on television until

the United States Government banned television advertisements in 1972.

111.    When cigarettes advertising was banned on television, Defendants turned to

marketing in stadiums, sponsoring sporting events such as the Winston Cup and Marlboro

500, sponsoring concerts, utilizing print advertisements in magazines, adding product

placement in movies, and more.

  

112.    Meanwhile, internally Defendants were praising themselves for accomplishing this

"brilliantly conceived" conspiracy which deceived ROSS FREITAS, millions of Americans,

the government, and the public health community.

> "[F]or nearly 20 years, this industry has employed a single strategy to defend itself…brilliantly conceived and executed…a holding strategy…creating doubt about the health charge without actually denying it" (Concealed Document 1972).

113.    In 1984, the American Tobacco Company commissioned a study of attitudes toward cigarettes made from additive-free tobacco and found that the additive-free label had "'significant appeal'" due to the phrase's health implications.

114.    The American Tobacco study also indicated that smokers needed "'reassurances'" and that, particularly when combined with fine-tobacco and natural-ingredients marketing themes, a no-additives label could appeal to half of all smokers.

115.    Between the 1970s and 1990s, several major tobacco companies -- including R.J. Reynolds, Brown and Williamson, Philip Morris, Lorillard, and Nat Sherman -- developed or planned to develop cigarettes with natural, organic, or additive-free attributes, intended to reach smokers with health concerns or to demonstrate the product's wholesomeness.

116.    Philip Morris, R.J. Reynolds, RAI and SFNT, their lawyers, their trade organizations, and other cigarette manufacturers conducted internal studies which furnished results indicating a positive attitude towards cigarette brands marketed as "natural," "additive free," or "organic" and a belief by consumers, such as Ross Freitas, that the harmful nature of cigarettes comes from the added chemicals and not the tobacco itself.

117.    SFNT Natural American's brand identify, including other elements of Natural American labels and advertising included themes like "Made with Organic Tobacco," "Tobacco and Water," and "Grown on American Soil" to support the company's PPOD.

118.    Defendants RAI, R.J. Reynolds, and SFNT furthered these false claims through the use of the term "Organic" on many of the labels for Natural American Spirit and in

advertisements. In addition, extensive use of Native American imagery in advertisements and on all labels of Natural American Spirit cigarettes reinforced the "naturalness" impressions of the labels.

119.    The tobacco industry knew that advertising cigarettes as pure and clean implied a healthier product.

120.    SFNT began selling Natural American cigarettes in 1985 and has marketed itself as a company committed to producing high-quality products in an environmentally conscious manner.

121.    Defendants RAI, R.J. Reynolds, and SFNT furthered these false claims through the use of the term "Organic" on many of the labels for Natural American Spirit and in advertisements. In addition, extensive use of Native American imagery in advertisements and on all labels of Natural American Spirit cigarettes reinforced the "naturalness" impressions of the labels.

122.    Additionally, Defendants RAI and SFNT further reinforced the false messaging of Natural American Spirit brand cigarettes through the numerous environmental claims made by Defendants' packaging and advertising. The back of all Natural American Spirit packages prominently states, "RESPECT FOR THE EARTH," next to an image of three feathers or leaves that closely resemble the well-known triple-arrow symbol for recycling. Certain packages made additional recycling and environmental claims, including, but not limited to, through statements such as "Pack Recycling," "Earth-Friendly Tobacco," "Supporting Farmers," "U.S. Grown Tobacco," and "Reducing Butt Litter."

123.    SFNT knew Natural American Spirit cigarettes contained higher concentrations of harmful and potentially harmful chemicals isolated in the smoke of Natural American

cigarettes, containing the highest total concentration of polycyclic aromatic hydrocarbons,[1] and highest mean concentrations for cadmium[2] and mercury[3] among the fifty mainstream U.S. cigarette brands.

124.    SFNT has internally acknowledged the higher concentrations of harmful and potentially harmful chemicals isolated in the smoke of Natural American Spirit cigarettes, compared to other R.J. Reynolds and non-R.J. Reynolds brands.

125.    SFNT conducted an internal comparison of deliveries of harmful constituents in Natural American Spirit Cigarettes and other leading competitive brands, results showed only Natural American cigarettes delivered more than 40mg of tar, and all 10 Natural American brands delivered more nicotine than other leading brands.

126.    In 1985, four rotating warning labels were placed on packs of cigarettes which warned, for the first time, that smoking causes lung cancer, heart disease, emphysema, and may complicate pregnancy.

127.    The cigarette industry, including Defendants herein, opposed these warning labels and throughout the 1980s, despite the warning labels being placed on their cigarettes, spoke publicly through their representatives in the Tobacco Institute (TI) that it was allegedly still unknown whether smoking cigarettes caused cancer or was addictive because, apparently, "more research was needed."

128.    In 1988, the United States Surgeon General reported that cigarettes and other forms of tobacco were addicting, and that nicotine is the drug in tobacco that causes addiction. In

---

[1] Polycyclic aromatic hydrocarbons are a class of known carcinogenic compound in cigarette smoke that does not occur naturally in the tobacco plant.
[2] "Cadmium is both a known carcinogen and associated with chronic obstructive pulmonary disease and nephrotoxicity." Mark R. Fresquez et al., Establishment of Toxic Metal Reference Range in Tobacco from U.S. Cigarettes
[3] "Mercury causes a wide array of well-known, deleterious health effects." Establishment of Toxic Metal Reference Range in Tobacco from U.S. Cigarettes

fact, in his report, the Surgeon General compared tobacco addictiveness to heroin and cocaine.

129.     In response, the cigarette industry, including Defendants herein, issued a press release knowingly and disingenuously stating, "Claims that cigarettes are addictive is irresponsible and scare tactics."

130.     Defendants continued to publicly deny the addictive nature and health hazards of smoking cigarettes until the year 2000, after litigation was brought against them by the Attorneys General of multiple States and their previously concealed documents were made public.

131.     By the late 1990s, the tobacco industry had taken notice of Natural American cigarettes' health-based appeal with several tobacco companies commissioning research to determine the impact of all-natural labeling on Natural American brand appeal. Brown and Williamson's research found that one of Natural American's key selling points was the perception that Natural American cigarettes were less harmful. In 1994 Philip Morris noted that American Spirit smokers said the cigarettes were healthier and less addictive because of the absence of additives and recognized that Natural American cigarettes were marketed and perceived by consumers as safer because they were additive free and therefore more healthful.

132.     In 1996 R.J. Reynolds' recognized that Natural American's growing popularity was due to an increasing demand for healthier products, especially in light of recent revelations that tobacco companies add several unsavory chemicals to their cigarettes, leading R.J. Reynolds to attempt to capitalize on the success of Natural American cigarettes by launching Winston Natural brand with advertisements of "No Additives" and "No Bull." R.J. Reynolds Winston Natural brand was not as successful as Natural American cigarettes, it was the

brands first market share gain in 25 years.

133.    SFNT marketing campaigns targeted consumers focused on lifestyles of health and sustainability, who have a clear connection of personal and planetary health, which drives purchase of natural products and highest likelihood to think that the environment affects their health.

134.    In the mid-1990s, between 89% and 100% of surveyed Natural American consumers indicated that the absence of additives was the primary reason for trying the brand. That number reached 100% in April 1996

135.    Natural additive-free, and organic labeling increases consumers' health benefit perception and drives both purchases of Natural American cigarettes and consumers' willingness to pay a premium. Natural American cigarettes would not have their current product differentiation or market standing if consumers had not believes that their products were safer and healthier than other cigarettes.

136.    Many of those who smoke Natural American brands, such as Ross Freitas, believe their product may be healthier or safer for them compared to other brands.

137.    Consumers perceive cigarettes marketed as 'natural' or 'additive-free' as less harmful, and this influences their perceptions of advertising claims and intention to purchase, controlling for other factors. Youth similarly rate cigarette labels that use the term 'natural' as "significantly more appealing to people their age and less harmful than packages without this term.

138.    Descriptors like organic, natural, and additive-free in Natural American cigarettes; marketing reduce non-smokers' former smokers, and current smokers' perceived harm associated with the cigarette brand compared to other brands. Nearly half of smokers believe that organic and additive-free cigarettes may be less harmful than other brands.

139.    Over the twentieth century, the tobacco industry developed a number of features intended to induce consumers to smoke cigarettes they perceived as safer, including: (i) toasted leaves, ostensibly to drive off poison; (ii) menthols and milds, to reduce irritation; (iii) king-sized and filtered cigarettes, to trap poisons; (iv) low-tars, lights, and ultralights, to reduce the toxic dose; and (v) natural, organic, and additive-free labels, to yield cleaner smoke.

140.    These product features and labels did not make cigarettes any safer. The tobacco industry knew that these features were effective at maintaining smokers' health misconceptions, noting, for instance, that "the 'illusion of filtration' -- in other words, what the consumer believes -- 'is as important as the fact of filtration."

141.    In 1994, CEOs from the seven largest cigarette companies, including Defendants herein, testified under oath before the United States Congress that it was their opinion that it had not been proven that cigarettes were addictive, caused disease, or caused one single person to die.

142.    After the industry executives testified before congress that cigarettes were not addictive and had not been proven to cause cancer, Defendants, including Philip Morris, continued to adhere to the controversy by stating both smokers and non-smokers deserve to know the facts, not innuendo, about cigarettes:

> Yesterday, Philip Morris and other U.S. tobacco manufacturers
> helped to set the record straight by speaking before a Congressional
> committee…
> Fact: Philip Morris does not add nicotine to its cigarettes…
> Fact: Philip Morris does not "manipulate" nicotine levels…
> Fact: Philip Morris does not believe cigarette smoking is addictive…
> Fact: None of the ingredients added in the manufacture of cigarettes
> is harmful as used…

143.    Despite their own intensive research and millions of internal documents describing the dangers and addictive qualities of cigarettes, Defendants negligently, willfully,

maliciously, and intentionally made false and misleading statements to Congress, the public, and ROSS FREITAS.

144.    Even after Defendants knowingly lied during these Congressional hearings, Defendants continued, and still continue, to perpetuate their conspiracy.

145.    For example, in 1997, Liggett announced that they would voluntarily place a warning label on their cigarette packages, in addition to the labels mandated by the United States government, that smoking is addictive. Defendant, Philip Morris, immediately filed a restraining order against Liggett to prevent them from adding this warning label. Then, in 1998, Liggett sold its three major cigarette brands, L&N, Lark, and Chesterfield, to Philip Morris, which in turn immediately removed the "smoking was addictive" warning label from these products.

146.    In 1999, SFNT marketing executive Henry Sicignano wrote to the company's president and board of directors: "[O]ur 'positioning' is what our brand stands for . . . what makes Natural American Spirit unique . . . why our product is better than other premium brands," and "'100% Additive-Free Natural Tobacco' is unmistakably the primary point of differentiation that has come to define our brand."

147.    The term "natural" is "central to both the brand name and that of its producer," and is "the fundamental differentiating feature of the product offering." The descriptors, couple with increased advertising, were a key part of the Natural American brand's strategic growth plan to driver consumers', such as Ross Freitas, to trial and ultimately convert to the product. These descriptors were so important, that SFNT considered not being able to use them as some of the brand's key risks, and planned on using substitute descriptors, such as a leaf logo, to represent respect for the environment.

148.    Philip Morris, R.J. Reynolds, RAI and SFNT, their lawyers, their trade

34

organizations, and other cigarette manufacturers knew that consumers, such as Ross Freitas, falsely believed cigarette brands marketed as "natural," "additive-free," "organic" were safer to smoke than other cigarettes. Pushing Philip Morris, R.J. Reynolds, and SFNT to capitalize on the country's increasing demand for healthier products by promoting their "health" brands including but not limited to: Merit, Basic, Real, True and Natural American cigarettes. Fraudulently marketed as "natural," "additive-free," and "organic," utilizing the façade of a safer cigarette to appeal to consumers, like Ross Freitas.

149.    In 2002, RAI purchased SFNT believing the company was in an excellent position to handle the pressure against the tobacco industry as a whole because of its continued use of additives, and that it should emphasize to as a substantial a cross section of the smoking public as possible that Natural American Spirit Cigarettes are "additive free."

150.    Following the purchase of SFNT by RAI, SFNT continued to project an image of being a small company focused on environmental sustainability, to bolster credibility of the company to sell "natural" and "additive-free" cigarettes that consumers perceived as less harmful.

151.    While the overall cigarette consumption in the United States is declining, Natural American Cigarette sales have been increasing.



*Data Source:* Sources: RAI 10Ks; Santa Fe Causal Reports; Calderon Dep. Ex. 28G; BAT Annual Report 2019

152.    Natural American is the only growing brand of conventional cigarette, with sales increasing by double digit percentages every year.

153.    This growth occurred because of Natural American Cigarettes' brand differentiation, which includes everything from our core proposition of additive free to organic styles.

154.    SFNT's PPODs are the first motivators that lead consumers to try Natural American cigarettes with the "natural," "additive-free" and "organic" PPODs accounting for 74% of consumers' initial trials.

155.    Furthermore, from 2000 through 2010, Defendants continued to mislead the public by marketing and promoting "light" and "ultra-light" cigarettes, despite knowing internally that such cigarettes were just as dangerous and addictive as "regular" cigarettes.

156.    In 2010, after Defendants were required by the United States government to remove the misleading "light" and "ultra-light" labels from their cigarettes, they instead "onserts" to their packages of cigarettes explaining that, for example, "Your Marlboro Lights pack is changing. But your cigarette stays the same. In the future, ask for 'Marlboro in the gold

36

pack.'"

157.    On August 21, 2015 the Food and Drug Administration ("FDA") published a study, titled Additive-Free and Natural Descriptors and Disclaimer Influence on Smokers' Perceptions of Natural American Spirit Cigarettes, which concluded that a disclaimer that "No additives in our tobacco does NOT mean a safer cigarette," did not offset the effect of "100% Additive-Free Natural Tobacco" and "natural" descriptors on consumers' opinions, and that tested Natural American Cigarette products conveyed "modified risk to consumers."

158.    The FDA reached the same conclusion in its review of Nat Sherman-Branded cigarettes, which features natural descriptors and the same disclaimer.

159.    The FDA concluded that conversely to expectations, "[w]hen the disclaimer was present on the pack label, consumers rated comparative exposure *lower* than when the disclaimer was absent."

160.    Disclaimers about cigarettes' safety, even when blown up to the size of the Surgeon General's warning and shown to survey participants, do not offset misperceptions of cigarettes' harms. For Example:

   a.    In 1967, the Federal Trade Commission ("FTC") concluded that a recently added cautionary statement on cigarette packs did not have a discernible effect on cigarette consumption;

   b.    The FTC released a similar study in 1981 that analyzed warnings that were included on cigarette packages beginning in 1970, which determined that they failed to inform consumers about smoking's hazards, and that consumers did not notice or read the warnings;

   c.    This pattern continues to the present day, with few smokers being able to tell what

the warnings are and otherwise not looking at or reading the warnings.

161.    On August 27, 2015, the FDA sent a warning letter advising Defendants R.J. Reynolds, RAI and SFNT that their use of the terms "natural" and "additive-free" on Natural American cigarettes; labeling "represents explicitly and/or implicitly that the products or their smoke do not contain or are free of a substance and/or that the products present a lower risk of tobacco-related disease or are less harmful than one or more other commercially marketed tobacco products.

162.    SFNT primary points of differentiation ("PPOD") was until 2017 that Natural American cigarettes are 100% additive-free natural tobacco and/or organic.

163.    Additionally, including as recently as 2018, Defendants have continued to oppose proposed FDA regulations which would reduce or eliminate nicotine in cigarettes.

164.    As recently as 2019, Defendants have not admitted and still do not admit or acknowledge that nicotine in their cigarette smoke "is" addictive.

165.    As recently as 2019, Defendants have not admitted and still do not admit or acknowledge that nicotine addiction can cause diseases.

166.    As recently as 2019, Defendants continue to make false or misleading statements that filtered cigarettes, lights, ultra-lights and low tar are less hazardous than conventional full favored cigarettes.

167.    Finally, Defendants have continued to target and prey upon children, teenagers, minorities, and other segment populations, all in the name of money.

168.    Defendants, despite being rivals and competitors, locked arms and banded together to purposefully and internationally engage in an over 65-year conspiracy to deceive the public regarding the addictive nature and health hazards of cigarette smoking.

169.    This sophisticated conspiracy involved hundreds of billions of dollars spent on

marketing efforts, massive deception, including lying under oath before Congress and other governmental entities, forming fake organizations with fake scientists and fake research, and creating a "brilliantly conceived: public relations campaign designed to create and sustain doubt and confusion regarding a supposed – made up – cigarette 'controversy' of their own invention.

170.    This conspiracy is memorialized through Defendants' own documents, authored by their own executives and scientists, including over fourteen million previously concealed records.

171.    From 1953 through 2000, Defendants made false or misleading statements including but not limited to the following:

    a.  Denying that smoking "is" addictive;

    b.  That smoking is not injurious to health;

    c.  That it is unknown if smoking causes serious diseases;

    d.  That scientific and medical community has not reached a consensus about the harms of smoking;

    e.  That scientific and medical community has not reached a consensus about the harms of smoking;

    f.  That no one knows what causes cancer;

    g.  That the tobacco industry made an honest effort to study the harms of smoking and a causal relationship had not need proven;

172.    From 1953 through the present, Defendants made false or misleading statements including but not limited to the following:

    a.  that filter, low tar and low nicotine, lights and ultra-light, are safe, or safer than full flavor cigarettes, and/or directly and/or indirectly made statements about their safety

and efficacy;

b. That organic, all natural, and additive-free are healthier, or safer than cigarettes that are not organic, all natural and additive-free.

173.     Throughout the same period, Defendants publicly attacked the validity of research suggesting any harmful effects from smoking.

*Conspiratorial Involvement by Defendants' Lawyers*

174.     Throughout this fifty-plus year conspiracy, Defendants and their coconspirators utilized attorneys – both in-house and outside counsel – to further their conspiracy. Defendants and their co-conspirators consulted with these attorneys both before any litigation was contemplated, and once litigation against the tobacco companies began.

175.     Philip Morris USA Inc., R.J. Reynolds Tobacco Company, British American Tobacco Company, American Tobacco Company, Lorillard Tobacco Company, Brown & Williamson Tobacco Company, and Liggett Group LLC, collectively and through their general counsel, formed the Committee of Counsel and/or the Counsel of Six (hereafter "CC"), whose purpose was to oversee, organize, operate, and execute a conspiracy to conceal and/or misrepresent the harms and addictive nature of cigarettes.

176.     Beginning in the 1950, Philip Morris USA, Inc., R.J. Reynolds Tobacco Company, British American Tobacco Company, American Tobacco Company, Lorillard Tobacco Company, Brown & Williamson Tobacco Company, and Liggett Group LLC, through the CC, also retained outside counsel to assist them in their conspiratorial activities, which included concealing and/or misrepresenting the harms of smoking and its addictive nature to the public.

177.     The law firms whom Defendants retained as outside counsel included several prominent law firms.

178.    Beginning in the 1950s, the corporate counsel and the outside law firms (hereafter "Lawyers") conspired with Defendants and acted as agents, servants, representatives and/or employees of Defendants in the course and scope of their agency or employment and in furtherance of the conspiracy.[4]

179.    The Lawyers played a central role in creating, sustaining, and perpetuating the Defendants' and the tobacco industry's conspiracy. Some examples include, but are not limited to the following:

a.    The Lawyers directed "scientists" as to what research they should and should not undertake ("new research [regarding the health effects of smoking] will have questionable value, but no negative results"); quote from an attorney: "epidemiological evidence is necessary if for no other reason than to effectively respond to anti-smoking groups… the industry should continue to emphasize the lack of substantive proof of causation");

b.    The Lawyers were involved at every level of alleged scientific "research" pursued by Defendants and the tobacco industry ("The excessive involvement of external lawyers at this very basic level is questionable");

c.    The Lawyers allegedly vetted scientific "research" paper and reports as well as public relations materials to ensure the interests of the conspiracy would be protected;

d.    The Lawyers improperly identified "friendly" scientific witnesses, subsidized them with grants from the Center for Tobacco Research and the Center for Indoor Air Research, paid them enormous fees, and often hid the relationship between those

---

[4] The allegations herein are not directed to Defendants' current counsel and/or their representation as part of their lawful defense in this case.

witnesses and the industry;

e. The Lawyers devised and carried out document destruction policies and took shelter behind baseless assertions of attorney client privilege;

f. The Lawyers advocated for tobacco committees to be "front" organizations; (one attorney stated in 1978 that an ad hoc committee should be a broad policy making committee, not just a smoking and health committee, and that the best way money was spent was on "special projects" where "CTR has acted as a 'front'");

g. The Lawyers chaired meetings with co-conspirators (one attorney chaired the Environmental Tobacco Smoke meeting in 1988);

h. The Lawyers presented the results of scientific studies at industry meetings (for example, in 1993, one attorney presented four epidemiologic studies which were used to "merchandize the 'positive' progress in epidemiology");

i. The Lawyers oversaw domestic smoking and health projects (for example, in 1998, one attorney and his firm advised Philip Morris regarding whether to initially fund, and whether to continue or discontinue funding, scientists);

j. The Lawyers also worked with and coached scientists on how to be possible witness in litigation, how to speak at legislative hearings, how to serve as consultants, and/or how to conduct specific supposed research;

k. They further oversaw international smoking and health projects (for example, in 1991, one attorney wrote a memo praising how the Latin American and Far East programs were ideal because a law firm developed them in such a way "that there was no direct association between the scientists and the tobacco industry");

l. The Lawyers screened international scientists in order to eliminate those with views opposing the conspiracy ("Candidates who have made public statements adverse to

42

the industry on the primary health issue generally are avoided:);

m. The Lawyers hid the source of the money used for special projects to make them appear more acceptable to the public:

    i. On November 15, 1978, at a CTR meeting in New York, one attorney told the attendees that "special projects" were the best way money was spent, and said "on these projects, CTR has acted as a 'front.'";

    ii. On July 13, 1984, a memorandum from one attorney to another stated, "[the] non-CTR projects fund was originally developed so that companies would not be paying scientists directly.";

    iii. In October 1989, a scientist from British American Tobacco, Dr. Ray Thornton, was invited by Dr. Helmut Gaisch of Philip Morris to a meeting with the Association for Research on Indoor Air (ARIA). Dr. Thornton's record indicates Philip Morris funded ARIA, through a law firm, who in turn supplied money to George Leslie, who in turn set up ARIA;

    iv. On April 28, 1992, an attorney wrote that Lorillard and CTR inquired about funding through a law firm's special account for one Dr. Bennett Jenson. The law firm proposed to give Dr. Jensen $40,000, not for specific research or with an eye to publication, but solely to maintain a good relationship with him and secure his continued help in contacting other scientists. Dr. Jensen previously received CTR Special Project Funds in 1988. An attorney wrote:

> Allinder admits that [the law firm] wants to give Jensen money to keep him happy and that there is no immediate value to his research . . . issue raises a larger question – whether 'CTR Special Projects' Funds (and, after such activities were moved out of CTR, joint industry funds administered through [the law firm]) were used to purchase favorable judicial or

legisltative testimony, thereby perpetrating a fraud on
the public" (CC119);

    n.  The Lawyers ensured that Defendants and the tobacco industry did not directly support legitimate projects related to smoking and health, and instead directed the companies toward supporting alternative projects including junk science, attacks on legitimate public health research, and research of scientifically implausible alternative causation theories for smoking-related diseases.

180.    The Lawyers were also crucial to the development of research the Defendants and the tobacco industry funded through their selection of Directors for the Center for Tobacco Research (CTR) Scientific Advisory Board (SAB) who imposed unnecessary limits on the research funded by CTR.

181.    Additionally, the outside Lawyers went so far as to take over access to a database of documents created by RJR's Research and Development division. The outside Lawyers banned the tobacco companies and their in-house counsel from accessing these documents in order to conceal the documents through a false assertion of alleged attorney work product privilege.

182.    Further, the Lawyers played a major role in Defendants' witness development plans to perpetuate the conspiracy's "open question" position.

    a.  For example, shortly after joining Brown & Williamson Tobacco Co. as Vice President of Research and Development in 1989, Jeffrey Wigand, as part of his orientation, was required to go to Kansas City, Missouri to meet for three days with lawyers from a law firm for an "orientation session." At the session, Wigand was "coached by lawyers regarding the company line on smoking and health, and addiction." The company line was "[t]hat causation had not been proven and that nicotine had not been shown to be addictive." Similar orientation meetings took

place with other tobacco scientists at the law firm's offices. (See *United States v. Philip Morris USA, Inc.,* 449 F.Supp. 2d 1, 805 (D.D.C. 2006)).

b.  Wigand described the orientation session as follows:

> Lawyers were instructing me, a scientist, how to interpret epidemiological studies. In every instance, I was instructed that the evidence in the public health domain had not satisfactorily proven causation. I was told that studies that demonstrated a link between smoking and cancer were fraught with errors. Moreover, I was told that epidemiology could not be relied upon because it was just statisticians doing guess work.

c.  In addition, an attorney from the same law firm sent a letter to a fellow attorney on briefing research associate and chemist Dr. Alex Spears (who would later become Lorillard's CEO) for a conversation with Physician and medical news reporter Dean Edell:

> CTR Special Projects, non-CTR projects and the Industry
>
> Research Committee are obviously sensitive. Dr. Spears
>
> should be prepared to respond to questions in a way that does
>
> not lead Edell into these areas. In particular, Dr. Spears
>
> should try to avoid references to the role of attorneys.
>
> However, this should not become too awkward. . . Dr. Spears
>
> should attempt to divert the question.

d.  Further, on January 12, 1967, another attorney at the same firm wrote to several other industry attorneys asking them for written comments regarding special projects and congressional hearings. Two attorneys wrote back stating they hoped materials being developed by TIRC/CTR head Tom Hoyt for various Special Projects would be useful in developing a witness to emphasize the importance of multivariant analysis over univariant ones. The two attorneys also recommended development of two

45

witnesses who could comment upon diseases other than lung cancer. They would present the position that the claimed associations have not been proven to be causal. As to one such potential witness, Dr. Pratt, they noted that while he had potential, he would require "considerable work" before he would be prepared to appear before Congress.

## Count I – Negligence

### (Against Philip Morris, R.J. Reynolds, RAI and SFNT)

183.    Plaintiff restates and incorporate herein the foregoing paragraphs of their Complaint.

184.    Philip Morris, R.J. Reynolds, RAI, and SFNT owed Ross Freitas a duty to exercise reasonable care in the design, development, manufacturing, testing, marketing, advertising, promotion, packaging, sale, and/or distribution of Marlboro Lights, Lucky Strike, and Natural American Spirit brand cigarettes.

185.    Philip Morris, R.J. Reynolds, RAI, and SFNT failed to exercise reasonable care in the design, development, manufacturing, testing, marketing, advertising, promotion, packaging, sale, and/or distribution of Marlboro Lights, Lucky Strike, and Natural American Spirit brand cigarettes.

186.    Philip Morris, R.J. Reynolds, RAI, and SFNT knew or should have known that, when used as intended, such cigarettes would cause human disease. Philip Morris, R.J. Reynolds, RAI, and SFNT also knew or should have known that, when used as intended by consumers, smoking Marlboro Lights, Lucky Strike, and Natural American Spirit brand cigarettes would likely lead to addiction and dependence.

187.    At all times relevant to this Complaint, it was illegal to sell cigarettes to persons under the age of 18. Despite this, Philip Morris, R.J. Reynolds, RAI, and SFNT deliberately marketed and/or distributed their cigarettes, including Marlboro Lights, and Natural

American Spirit brand cigarettes in a manner calculated to induce purchases and use of their cigarettes by minors, whose use would involve an unreasonable risk of injury. Philip Morris, R.J. Reynolds, RAI, and SFNT breached their duty to exercise reasonable care in numerous respects.

188.     Philip Morris, R.J. Reynolds, RAI, and SFNT themselves, and through their lawyers, trade associations, and other cigarette manufacturers, also negligently misrepresented to members of the media, congress, and the public, including Mr. Freitas, that their cigarettes were not carcinogenic or addictive. Philip Morris, R.J. Reynolds, RAI, and SFNT, their trade organizations, their lawyers, and other cigarette manufacturers knew or should have known of the falsity of such representations.

189.     As a direct and proximate result of Philip Morris', R.J. Reynolds', RAI's and SFNT's negligence, Ross Freitas developed COPD and suffering a heart attack , resulting in conscious pain and suffering, mental anguish, the expense of medical and/or nursing care and treatment, and other losses for which Plaintiff is entitled to recover the damages sought in this Complaint.

Count II
Breach of Warranty – Defective Design
(Against All Defendants)

190.     Plaintiff restates and incorporate herein the foregoing paragraphs of their Complaint.

191.     At all relevant times, Philip Morris, R.J. Reynolds, WALMART, RAI, and SFNT engaged in the business of manufacturing, testing, designing, advertising, marketing, packaging, selling, and/or distributing Marlboro Lights, Lucky Strike, and Natural American Spirit brand cigarettes and placing these cigarettes into the stream of commerce in the State of Florida.

192.     Marlboro Lights, and Natural American Spirit brand cigarettes were expected to and

47

did reach Ross Freitas in substantially the same condition they were in when originally manufactured, distributed, and/or sold by Philip Morris, R.J. Reynolds, RAI, SFNT, and re-sold by Walmart.

193.     Philip Morris, R.J. Reynolds, RAI, SFNT, and WALMART– as the manufacturers, sellers, marketers, and/or distributors of Marlboro Lights, and Natural American Spirit brand cigarettes – impliedly warranted that such cigarettes were merchantable and fit for the ordinary purposes for which they were intended.

194.     Philip Morris, R.J. Reynolds, RAI, SFNT, and WALMART breached this warranty because the cigarettes they manufactured, sold, and/or distributed to Ross Freitas and other members of the public were defective and unreasonably dangerous to users and consumers.

195.     Such cigarettes were carcinogenic, addictive, and contained dangerous levels of tar, nicotine, and other dangerous substances. The foreseeable risks posed by Marlboro Lights, and Natural American Spirit brand cigarettes could have been reduced or eliminated by Philip Morris', R.J. Reynolds', RAI's, and/or SFNTs adoption of safer reasonable alternative designs that were technologically and commercially available and feasible.

196.     At all times relevant to this Complaint, Ross Freitas used and consumed Marlboro Lights, and Natural American Spirit cigarettes designed, manufactured, sold, and/or distributed by Philip Morris, R.J. Reynolds, RAI, SFNT, and WALMART in the manner in which Philip Morris, R.J. Reynolds, RAI, SFNT, and WALMART intended and expected such cigarettes to be used.

197.     As a direct and proximate result of Philip Morris', R.J. Reynolds', RAI's, SFNT's, and WALMART' breach of warranty, Ross Freitas developed COPD and suffering a heart attack , resulting in pain and suffering, mental anguish, the expense of medical and/or nursing care and treatment, lost earnings, and other losses for which Plaintiff is entitled to

recover the damages sought in this Complaint.

## Count III
## Fraudulent Misrepresentation
### (Against Philip Morris, R.J. Reynolds, RAI and SFNT)

198.    Plaintiff restates and incorporate herein the foregoing paragraphs of their Complaint.

199.    Beginning at an exact time unknown to Plaintiff, and continuing even today, the cigarette manufacturers, including Defendants herein, have carried out, and continue to carry out a campaign designed to deceive the public, including ROSS FREITAS, the government, and others, as to the health hazards and addictive nature of cigarettes, through false statements and/or misrepresentations of material facts.

200.    The cigarette manufacturers, including Defendants herein, made literally thousands of misrepresentations to the Plaintiff and others similarly situated over the course of the last fifty years. Plaintiff is unable to allege in full these misrepresentations, which are found in thousands of pre-1969 advertisements, continuing press releases, testimony by cigarette manufacturers' officers and employees before Congress and other governmental entities, etc., that the cigarette manufacturers and their co-conspirators , THE TOBACCO INSTITUTE, INC. ("TI") formed in 1958, TOBACCO INDUSTRY RESEARCH COMMITTEE ("TIRC") formed in 1954, and COUNCIL for TOBACCO RESEARCH ("CTR") formed in 1964 and previously known as the TIRC, both because she does not have access to this information, and because to allege each and every such misrepresentation and/or false statement here would entail hundreds or even thousands of pages of pleadings. Indeed, it is the cigarette manufacturers themselves, including Defendants herein, that have this knowledge and information, and are in the best position to know the contents of each and every such misrepresentation and/or false statement.

201.    Defendants    made    intentional    misrepresentations,    false    promises,    concealed

49

information, and failed to disclose material information concerning the health effects and addictive nature of cigarettes to ROSS FREITAS, the public, and the American government.

202.    Defendants carried out their campaign of fraud, false statements, and/or misrepresentations in the following ways, without limitation:

a.  Defendants falsely represented to ROSS FREITAS that questions about smoking and health would be answered by unbiased, trustworthy sources;

b.  Defendants misrepresented and confused facts about health hazards of cigarettes and nicotine addiction;

c.  Defendants, along with other cigarette manufacturers, spent billions of dollars hiring lawyers, fake scientists, and public relations firms to misdirect purported "objective" scientific research;

d.  Defendants discouraged meritorious litigation by engaging in "scorched earth" tactics, as noted in a previously secret 1988 document: "to paraphrase General Patton, the way we won these cases was not by spending all of [our] money, but by making that other son of a bitch spend all of his;"

e.  Defendants suppressed and distorted evidence concerning the health effects and addictive nature of cigarettes to protect their existence and profits;

f.  Defendants designed, marketed, and sold so-called "filtered" and "light" cigarettes despite knowing internally that such cigarettes were just as addictive, dangerous, and deadly as "regular" cigarettes.

    i.  Defendants knew their system to measure the tar and nicotine was neither a valid nor reliable way to measure the amount of tar and nicotine inhaled by an actual smoker.

    ii.  Notwithstanding same, the Defendants marketed "Light" cigarettes to

50

consumers as a safer alternative based upon said measuring system.

   iii.   Defendants manipulated the design of cigarettes to produce test results that were artificially low.

   iv.   Defendants knew that "Light" cigarette smokers compensate to obtain the same level of tar or nicotine as non-light cigarettes either by taking more puffs on each cigarette, by taking larger, longer or deeper puffs, and/or by smoking more cigarettes.

g.   Defendants continued to fraudulently market and sell "mild, "low tar", and "light" cigarettes through 2010 despite knowing they were no safer than 'full flavor' cigarettes and knowing consumers perceived them as safer.

   i.   The cigarette manufacturers, including Defendants herein, were ultimately prohibited by Congress from marketing "mild", "low tar", and "light" cigarettes when Congress passed the Family Smoking Prevention and Tobacco Control Act, Public Law 111-31 (June 22, 2009), which became effective on June 22, 2010.

   ii.   Despite the congressional ban, the cigarette manufacturers, including Defendants herein, have continued to market and sell even today the same "mild", "low tar", and "light" cigarettes, only these cigarettes are marketed with a new package coloring scheme in order to get around the banned light descriptors.

   iii.   These cigarettes are the same or substantially the same as the pre-prohibition "mild', "light", and "low tar" cigarettes. By design, consumers often perceive the color descriptors on packaging as suggesting the cigarettes are less harmful to smoke than regular or full flavor brands.

iv. The cigarette manufacturers, including Defendants herein, are thus able to continue fraudulently misrepresenting the "light", "low tar" and "mild cigarette marketing the ban was designed to prevent.

h. Defendants designed, marketed, and sold so-called "natural" and "additive-free" cigarettes despite knowing internally that such cigarettes were knowing internally that such cigarettes were just as addictive, dangerous, and deadly as "regular" cigarettes.

i. Defendants knew Natural American Spirit cigarettes are not healthier or safer than other cigarettes. Natural American Spirit cigarettes have substantially higher levels of certain known carcinogens and heavy metals. Natural American Spirit cigarettes also release exceedingly high levels of "free-base" nicotine, which makes them at least as addictive as other cigarettes.

ii. Defendants knew consumers perceived cigarette brands marketed as "natural," "additive-free," or "organic" as healthier and a belief by consumers that the harmful nature of cigarettes comes from the added chemicals and not the tobacco itself.

iii. Defendants knew Natural American Spirit cigarettes were not "Additive-Free." RAI and SFNT use citrate, a burn accelerator in the cigarette papers. Non-mentholated Natural American Spirit cigarettes contain non-native tobacco components including but not limited to: acetophenone, toluic aldehyde, safranal, anethole and diosphenol.

iv. Notwithstanding same, the Defendants marketed Natural American Spirit cigarettes as "natural" and "additive-free" to consumers as a healthier alternative to other cigarette brands.

52

     v.  Defendants knew that Natural American Spirit cigarette smokers would receive the same if not more nicotine as other cigarettes either by taking more puffs on each cigarette, by taking larger, longer or deeper puffs, and/or by smoking more cigarettes.

i.  Defendants continued to fraudulently market and sell "natural", and "additive-free" cigarettes through 2017 despite knowing they were no safer, and no healthier than any other cigarette.

     i.  The cigarette manufacturers, including Defendants herein, were ultimately prohibited by the Food and Drug Administration ("FDA") from marketing "natural" and "additive-free" cigarettes in January 2017.

     ii.  Despite the FDA prohibition, the Defendants have continued to market and sell even today the same "natural" and "additive-free" cigarettes, only now these cigarettes are marketed as "Real. Simple. Different.," and contain ingredient descriptions of "Tobacco, Water" in order to get around the prohibited natural, additive-free descriptors.

     iii.  These cigarettes are the same or substantially the same as the pre-prohibition "natural" and "additive-free" cigarettes. By design, consumers often perceive the ingredient list on the packaging as suggesting the cigarettes are less harmful to smoke than other cigarette brands.

     iv.  The cigarette manufacturers, including Defendants herein are thus able to continue fraudulently misrepresenting the "natural" and "additive-free" cigarette marketing that the prohibition was designed to prevent.

j.  Cigarette manufacturers, including Defendants herein, knew cigarettes were dangerous and addictive. It became their practice, purpose, and goal to question any

scientific research which concluded cigarettes were dangerous. They did this through misleading media campaigns, mailings to doctors and other scientific professionals, and testimony before governmental bodies.

k.   Defendants made multiple misrepresentations to ROSS FREITAS, including misrepresentations and misleading statements in advertisements, news programs and articles, media reports, and press releases, concerning the health effects  and addictive nature of cigarettes, including "light", "natural", and "additive-free" cigarettes.

203.   Throughout the years, Defendants and co-conspirators have repeatedly stated that cigarettes were not dangerous, and that they would either remove harmful constituents or stop making cigarettes altogether. Some examples include:

a.   A 1970 advertisement from the Tobacco Institute said: "[t]he Tobacco Institute believes the American public is entitled to complete, information about cigarette smoking and health."

b.   In 1971, Joseph Cullman, Chairman of Philip Morris, stated on Face the Nation, "we do not believe that cigarettes are hazardous; we do not accept that."

c.   In 1972 Philip Morris vice president James Bowling repeated the company's promise to consumers two decades earlier that "if our product is harmful, we'll stop making it."

d.   Bowling repeated the company's position on smoking and health in a 1976 interview when he noted: "from our standpoint, if anyone ever identified any ingredient in tobacco smoke as being hazardous to human health or being something that shouldn't be there, we could eliminate it. But no one ever has."

e.   In a 1978 magazine interview William Dwyer, vice president of the Tobacco

54

Institute, stated: "we take the view of the best science can say is that cigarette smoking, maybe hazardous. And then it may not be."

f.  A 1978 Philip Morris publication entitled "facts about the smoking controversy" stated: "scientist have not determined what causes cancer... cigarettes have never been proven unsafe."

g.  In 1985, R.J. Reynolds took out advertisements in major newspapers and magazines which stated: "We believe in science. That is why we continue to provide funding for independent research into smoking and health...science is science. Proof is proof. That is why controversy over smoking and health remains an open one."

204.    Defendants continued to make these and similar statements well into the 1990s, with the goal of convincing consumers to start and keep smoking, not reduce their smoking, and/or not quit.

205.    Defendants and the tobacco industry promoted their message through many press releases and statements and through less obvious methods, including influencing the content of apparently neutral articles and cultivating opinion leaders who would convey their message. Defendant and the tobacco industry communicated their message through all forms of available media, including newspapers, magazines, and television.

206.    Industry spokespersons appeared on news shows, on commercials and public television to state falsely that the evidence concerning the health effects of tobacco was based primarily on statistical relationships and that there was no proof that a specific tobacco component caused a specific disease and that cigarette smoking was not addictive.

207.    Cigarette manufacturers when sued denied that cigarettes were addictive and claimed that smoking was a matter of free choice and that smokers could simply quit smoking if they so wanted.

208.     Cigarette manufacturers claimed attorney-client privilege to shield as many documents as possible from disclosure and destroyed and/or refused to produce documents related to health issues and plaintiff's claims.

209.     Cigarette manufacturers, when sued for smoking-related injuries, conducted the litigation in such a way as to cause the maximum expenditure of time and resources by the claimants for the purposes of exhausting their adversaries' resources and to discourage other meritorious litigation.

210.     These misrepresentations and false statements include, but are not limited to, the aforementioned statements and actions contained herein, including in the Historical Allegations of Defendants Unlawful Conduct Giving Rise to the Lawsuit section above.

211.     These misrepresentations and false statements also include the following statements which were heard, read, and relied upon by Plaintiff, ROSS FREITAS, who remembered these statements or substantially similar statements, made by Defendants, their co-conspirators, and their spokespeople:

a.  That the addictive nature and health effects of smoking were matters of "open debate." "It is not known whether cigarettes cause cancer, it has not be casually established." Edward Horrigan, President of R.J. Reynolds Tobacco Company on ABC Nightline 1984.

b.  Despite all of the research to date there has been no causal link established [between cigarette smoking and cancer]." Edward Horrigan, President of R.J. Reynolds Tobacco Company on ABC Nightline 1984.

c.  "There is absolutely no proof that cigarettes are addictive." Edward Horrigan, CEO of R.J. Reynolds, Congressional Testimony 1982.

d.  "Claims that cigarettes are addictive [are] irresponsible and scare tactics." Tobacco

Industry Response to 1988 United States Surgeon General's Report.

    e.    To my knowledge , it's not been proven that cigarette smoking causes cancer."
William Campbell, CEO Philip Morris, Congressional Testimony, 1993.

212.     The aforementioned acts, false statements and/or misrepresentations which were made and/or caused to be made by the cigarette manufacturers, either directly or indirectly including Defendants herein and their co-conspirators, were justifiably relied upon by ROSS FREITAS, resulted in ROSS FREITAS being unaware of the extent of the danger of the Defendants cigarette products, the addictive nature of Defendants cigarette products, and that filtered and "light" cigarettes were just as dangerous as regular and/or unfiltered cigarettes.

213.     Furthermore, ROSS FREITAS relied on Defendants' false and misleading marketing and advertisements of cigarettes, which caused him to start and continue smoking filtered cigarettes, including but not limited to the following:

    a.    False and misleading commercials.

    b.    False and misleading marketing gimmicks and jingles including but not limited to the Winston Jingle "Winston tastes good like a cigarette should," the iconic "Marlboro Man," "Marlboro Country," "Walk a Mile for Camel," "Joe Camel."

    c.    False and misleading marketing tactics regarding "filtered" cigarettes which caused Mr. Freitas to smoke a filtered cigarette which caused and contributed to him developing COPD and suffering a heart attack.

214.     Additionally, ROSS FREITAS, relied on Defendants' false and misleading marketing and advertisements of cigarettes, which caused him to start and continue smoking American Spirit cigarettes, including but not limited to the following:

    a.    False and misleading commercials.

b.  False and misleading marketing by prominently using the terms "Natural" and "Additive-Free" in a pervasive nationwide marketing and advertising campaign. Defendants RAI and SFNT.

c.  False and misleading marketing tactics regarding Natural American Spirit cigarettes through the use of the term "Organic" on many of the labels for Natural American Spirit and in advertisements. Defendants RAI and SFNT false and misleading descriptors convey implicit health claims defying the court ordered ban on any cigarette descriptors making health claims after January 1, 2007.[5] Defendants RAI and SFNT continued to market Natural American Spirt brand cigarettes as "Additive-Free" and "Organic" until 2017. In addition, extensive use of Native American imagery in advertisements and on all labels of Natural American Spirit cigarettes reinforced the "naturalness" impressions of the labels.

d.  False and misleading messaging of Natural American Spirit brand cigarettes through the numerous environmental claims made by Defendants' packaging and advertising. The back of all Natural American Spirit packages prominently states, "RESPECT FOR THE EARTH," next to an image of three feathers or leaves that closely resemble the well-known triple-arrow symbol for recycling. Certain packages made additional recycling and environmental claims, including, but not limited to, through statements such as "Pack Recycling," "Earth-Friendly Tobacco," "Supporting Farmers," "U.S. Grown Tobacco," and "Reducing Butt Litter."

215.  ROSS FREITAS, during the course of his smoking history, heard some or all of the false or misleading statements and/or similar statements made directly or indirectly by the Defendants, believed some or all of the Defendants' false or misleading statements and

---

[5] U.S. v. Philip Morris USA, Inc., 449 F.Supp.2d 1, 925 (D.D.C. 2006)

relied upon them to his detriment, and smoked and/or continued to smoke cigarettes based on such false or misleading statements.

216.    The aforementioned acts, false statements and/or misrepresentations which were made and/or caused to be made by the cigarette manufacturers, including Defendants herein, and their co-conspirators were justifiably relied upon by ROSS FREITAS, resulted in him being unaware of the extent of the danger of the Defendants' cigarette products, the addictive nature of Defendants' cigarette products, and that low tar, low nicotine, filtered, natural and/or additive-free cigarettes were just as dangerous as regular, unfiltered, non-natural, and/or non-additive-free cigarettes. Such acts, false statements and/or misrepresentations were made by the Defendants who had knowledge superior to ROSS FREITAS regarding the health aspects and addictive nature of cigarettes.

217.    As a direct and proximate result of these aforementioned statements, Plaintiff, ROSS FREITAS, continued to smoke cigarettes which caused or contributed to him developing COPD and suffering a heart attack.

218.    If ROSS FREITAS had known the true health hazards and addictive nature of cigarettes, she would not have started smoking, nor smoked light, low tar, filtered, natural, and/or additive-free cigarettes, nor continued to smoke for many years.

219.    As a direct and proximate result of these aforementioned statements, Plaintiff, ROSS FREITAS, relied upon the assurances from the tobacco industry, including statements and sworn congressional testimony from Defendants' CEOs and also statements from the Defendants' spokesmen and women hired by Defendants and their co-conspirators , and as a direct and proximate result of that reliance, continued to smoke cigarettes.

220.    Defendants made intentional misrepresentations to Plaintiff, ROSS FREITAS, in the following ways:

a. The aforementioned representations were regarding material facts about cigarettes and were knowingly false;

b. Defendants knew said representations were false at the time they made such statements;

c. Defendants knew ROSS FREITAS did not possess sufficient information to understand or appreciate the dangers of cigarettes;

d. Defendants intended to induce ROSS FREITAS, and did indeed induce ROSS FREITAS, to rely upon the aforementioned false representations/acts/statements;

e. ROSS FREITAS was unaware of the falsity of Defendants' aforementioned false misrepresentation/acts statements;

f. ROSS FREITAS was justified in relying upon Defendants' misrepresentations because they were made by Defendants, who possessed superior knowledge regarding the health hazards and addictive nature of cigarettes;

g. As a direct and proximate and/or legal cause of Defendants' intentional misrepresentations, ROSS FREITAS became addicted to cigarettes and developed COPD and suffering a heart attack.

221.    Furthermore, Defendants made false promises to Plaintiff, ROSS FREITAS, in the following ways:

a. By making false promises to the public, including ROSS FREITAS that Defendants would (i) cooperate with public health, including the Surgeon General, (ii) conduct allegedly "objective" research regarding the addictive nature and health hazards of cigarettes, (iii) remove any harmful elements to cigarettes, if there were any, (iv) form purported "objective" research committees dedicated to undertaking an interest in health as its "basic responsibility paramount to every other consideration," (v)

60

falsely pledging to provide aid and assistance to research cigarette use and health and others;

b. At all times material, Defendants did not intend to keep their promises;

c. Defendants made these promises with the intent to induce Plaintiff to begin and continue smoking;

d. ROSS FREITAS was unaware of Defendants' intention not to perform their promises;

e. ROSS FREITAS acted in reliance upon Defendants' promises;

f. ROSS FREITAS was justified in relying upon Defendants' promises;

g. As a direct and proximate and/or legal cause of Defendants' false promises, ROSS FREITAS became addicted to cigarettes and developed COPD and suffering a heart attack.

222.    Defendants' conduct was the actual and proximate or legal cause of ROSS FREITAS'S injuries. Plaintiff has sustained damages consisting of developing COPD and suffering a heart attack , to incur significant medical expenses, and to endure enormous pain and suffering.

## Count IV
## Fraudulent Concealment
## (Against Philip Morris, R.J. Reynolds, RAI and SFNT)

223.    Plaintiff restates and incorporate herein the foregoing paragraphs of their Complaint.

224.    Beginning at an exact time unknown to ROSS FREITAS, and continuing today, cigarette manufacturers, including Defendants herein, have carried out, and continue to carry out a campaign designed to deceive the public, including ROSS FREITAS, physicians, the government, and others, to the true dangers of cigarettes.

225.    Cigarette manufacturers, including Defendants herein, carried out their plan by

concealing and suppressing facts, information, and knowledge about the dangers of smoking, including addiction.

226.    Defendants carried out their scheme by concealing their knowledge concerning the dangerous and addictive nature of cigarettes as set forth in the Historical Allegations of Defendants Unlawful Conduct Giving Rise to the Lawsuit allegations referenced above.

227.    Defendants also carried out such scheme by concealing their knowledge concerning, but not limited to, the following:

a.  the highly addictive nature of nicotine in cigarettes;

b.  the design of cigarettes to make them more addictive and easier to inhale;

c.  the manipulating and controlling of nicotine content of their products to create and perpetuate users' addiction to cigarettes;

d.  the manufacturing and engineering process of making cigarettes, including adding chemicals and other deadly, poisonous compounds to cigarettes;

e.  the deliberate use of ammonia technology and/or certain tobacco blends to boost the pH of cigarette smoke to "free base" nicotine in cigarettes;

f.  their intentional use of tobacco high in nitrosamines a potent carcinogen not found in natural, green tobacco leaf, but created during the tobacco curing process;

g.  their scheme to target and addict children to replace customers who were dying from smoking cigarettes;

h.  the true results of their research regarding the dangers posed by smoking cigarettes and the addictive nature of cigarettes. For example, in response to the 1965 Surgeon General report that related cigarette smoking to lung cancer in men, the cigarette manufacturers, including Defendants herein, concealed their research from the year prior which concluded:

Moreover, nicotine is addictive. We are, then in the business of selling nicotine, an addictive drug effective in the release of stress mechanisms ... But cigarettes - we assume the Surgeon General's Committee to say - despite the beneficent effect of nicotine, have certain unattractive side effects:

1.  They cause, or predispose to, lung cancer.

2.  They contribute to certain cardiovascular disorders.

3.  They may well be truly causative in emphysema, etc.

i.  the risks of contracting cancer, including but not limited to laryngeal cancer, esophageal cancer, other head and neck cancers, oral cancer, emphysema, COPD, lung cancer, heart disease, strokes, bladder cancer, and other forms of cancer;

j.  filtered, low tar, nicotine, "light," "natural," and/or "additive-free" cigarettes were not safe, safer, or less dangerous than "regular" cigarettes;

k.  The Federal Trade Commission ("FTC") method of measuring "tar & nicotine" levels underestimated and did not accurately reflect the levels of tar and nicotine delivered to a smoker;

l.  by continuing even today to fraudulently market and sell multiple brands as "filtered" knowing that smokers wrongly believe that filtered cigarettes reduce the harms of smoking and despite knowing internally that such cigarettes are just as addictive, dangerous, and deadly as non-filtered cigarettes.

m.  By continuing today to fraudulently market and sell Natural American Spirit as "Real. Simple. Different.," with ingredient descriptions of "Tobacco, Water" knowing that smokers wrongly believe that the ingredient list to be conclusive and healthier, despite knowing internally that Natural American Spirit cigarettes are just as addictive, dangerous, and deadly as all other cigarettes.

228.    Cigarette manufacturers, including Defendants herein, through their actions,

funding, and involvement with TIRC/CTR, also concealed and/or made fraudulent statements and misrepresentations to the public, including ROSS FREITAS, including but not limited to the following:

    a.  falsely concealing that the true purpose of TIRC/CTR was public relations, politics, and positioning for litigation;

    b.  falsely pledging to provide aid and assistance to research cigarette use and health;

    c.  expressly undertaking a disingenuous interest in health as its "basic responsibility paramount to every other consideration;"

    d.  affirmatively assumed a (broken) promise to truthfully disclose adverse information regarding the health hazards of smoking;

    e.  purposely created the illusion that scientific research regarding the dangers of cigarettes was being conducted and the results of which would be made public;

    f.  concealing information regarding the lack of bona fide research being conducted by TIRC/CTR and the lack of funds being provided for research'

    g.  concealing that TIRC/CTR was nothing more than a "public relations" front and shield.

229.    Cigarette manufacturers, including Defendants herein, knew cigarettes A were dangerous and addictive. It became their practice, purpose, and goal to question any scientific research which concluded cigarettes were dangerous. They did this through misleading media campaigns, mailings to doctors and other scientific professionals, and testimony before governmental bodies.

230.    Defendants made multiple misrepresentations to ROSS FREITAS including misrepresentations and misleading statements in advertisements, news programs and articles, media reports, and press releases.

64

231.     Throughout the years, Defendants and their co-conspirators have repeatedly stated that cigarettes were not dangerous, and that they would either remove harmful constituents or stop making cigarettes altogether. Some examples include:

a.  A 1970 advertisement from the Tobacco Institute said: "[t]he Tobacco Institute believes the American public is entitled to complete, information about cigarette smoking and health."

b.  In 1971, Joseph Cullman, Chairman of Philip Morris, stated on Face the Nation, "we do not believe that cigarettes are hazardous; we do not accept that."

c.  In 1972 Philip Morris vice president James Bowling repeated the company's promise to consumers two decades earlier that "if our product is harmful, we'll stop making it."

d.  Bowling repeated the company's position on smoking and health in a 1976 interview when he noted: "from our standpoint, if anyone ever identified any ingredient in tobacco smoke as being hazardous to human health or being something that shouldn't be there, we could eliminate it. But no one ever has."

e.  In a 1978 magazine interview William Dwyer, vice president of the Tobacco Institute, stated: "we take the view of the best science can say is that cigarette smoking, maybe hazardous. And then it may not be."

f.  A 1978 Philip Morris publication entitled "facts about the smoking controversy" stated: "scientist have not determined what causes cancer… cigarettes have never been proven unsafe."

g.  In 1985, R.J. Reynolds took out advertisements in major newspapers and magazines which stated: "We believe in science. That is why we continue to provide funding for independent research into smoking and health…science is science. Proof is proof.

65

That is why controversy over smoking and health remains an open one."

232.    Defendants continued to make these and similar statements well into the 1990s, with the goal of convincing consumers to start and keep smoking, not reduce their smoking, and/or not quit.

233.    Defendants and the tobacco industry promoted their message through many press releases and statements and through less obvious methods, including influencing the content of apparently neutral articles and cultivating opinion leaders who would convey their message. Defendant and the tobacco industry communicated their message through all forms of available media, including newspapers, magazines, and television.

234.    Industry spokespersons appeared on news shows, on commercials and public television to state falsely that the evidence concerning the health effects of tobacco was based primarily on statistical relationships and that there was no proof that a specific tobacco component caused a specific disease and that cigarette smoking was not addictive.

235.    Cigarette manufacturers when sued denied that cigarettes were addictive and claimed that smoking was a matter of free choice and that smokers could simply quit smoking if they so wanted.

236.    Cigarette manufacturers claimed attorney-client privilege to shield as many documents as possible from disclosure and destroyed and/or refused to produce documents related to health issues and plaintiff's claims.

237.    Cigarette manufacturers, when sued for smoking-related injuries, conducted the litigation in such a way as to cause the maximum expenditure of time and resources by the claimants for the purposes of exhausting their adversaries' resources and to discourage other meritorious litigation.

238.    The concealed statements and misrepresentations which concealed material

information about the health hazards of cigarettes also include the following statements where were heard, read and relied upon by Plaintiff, ROSS FREITAS, who remembers these or substantially similar statements made by Defendants, their co-conspirators, and their spokespeople:

    a.  That the addictive nature and health effects of smoking were matters of "open debate." "It is not known whether cigarettes cause cancer, it has not be casually established." Edward Horrigan, President of R.J. Reynolds Tobacco Company on ABC Nightline 1984.

    b.  Despite all of the research to date there has been no causal link established [between cigarette smoking and cancer]." Edward Horrigan, President of R.J. Reynolds Tobacco Company on ABC Nightline 1984.

    c.  "There is absolutely no proof that cigarettes are addictive." Edward Horrigan, CEO of R.J. Reynolds, Congressional Testimony 1982.

    d.  "Claims that cigarettes are addictive [are] irresponsible and scare tactics." Tobacco Industry Response to 1988 United States Surgeon General's Report.

    e.  To my knowledge , it's not been proven that cigarette smoking causes cancer." William Campbell, CEO Philip Morris, Congressional Testimony, 1993.

239.    The aforementioned acts, false statements and/or misrepresentations which were made and/or caused to be made by the cigarette manufacturers, either directly or indirectly including Defendants herein and their co-conspirators, were justifiably relied upon by ROSS FREITAS, resulted in ROSS FREITAS being unaware of the extent of the danger of the Defendants cigarette products, the addictive nature of Defendants cigarette products, and that filtered and "light" cigarettes were just as dangerous as regular and/or unfiltered cigarettes.

240.    Furthermore, ROSS FREITAS relied on Defendants' false and misleading marketing and advertisements of cigarettes, which caused him to start and continue smoking filtered cigarettes, including but not limited to the following:

   a.   False and misleading commercials.

   b.   False and misleading marketing gimmicks and jingles including but not limited to the Winston Jingle "Winston tastes good like a cigarette should," the iconic "Marlboro Man," "Marlboro Country," "Walk a Mile for Camel," "Joe Camel."

   c.   False and misleading marketing tactics regarding "filtered" cigarettes which caused Mr. Freitas to smoke a filtered cigarette which caused and contributed to him developing COPD and suffering a heart attack .

241.    During the course of ROSS FREITAS's smoking history, she heard some or all of the false and misleading statements above and/or similar statements made directly or indirectly by Defendants and their co-conspirators, believed some or all of the Defendants' and their co=conspirators' false and misleading statements, and relied to his detriment and continued to smoke cigarettes based on such false and misleading statements.

242.    As a direct and proximate result of these aforementioned statements, Plaintiff, ROSS FREITAS, continued to smoke cigarettes which caused or contributed to him developing COPD and suffering a heart attack .

243.    If ROSS FREITAS had known the true health hazards and addictive nature of cigarettes, she would not have started smoking, nor smoked light, low tar, filtered, natural, and/or additive-free cigarettes, nor continued to smoke for many years.

244.    As a direct and proximate result of these aforementioned statements, Plaintiff, ROSS FREITAS, relied upon the assurances from the tobacco industry, including statements and sworn congressional testimony from Defendants' CEOs and also statements from the

Defendants' spokesmen and women hired by Defendants and their co-conspirators , and as a direct and proximate result of that reliance, continued to smoke cigarettes.

245.    ROSS FREITAS and others similarly situated justifiably relied upon cigarette manufacturers, including the Defendants herein, the TIRC, and the CTR to disseminate knowledge and information which they possessed regarding the health hazards of cigarettes, especially after the industry chose to repeatedly and publicly deny the harms of smoking and the addictive nature of cigarettes/nicotine. ROSS FREITAS, during the course of his smoking history, heard some or all of these false and misleading statements and/or similar statements made directly or indirectly by the Defendants, believed some or all of the Defendants' false and misleading statements, and relied to his detriment, and smoked and/or continued to smoke cigarettes based on such false and misleading statements.

246.    The aforementioned information and/or knowledge concealed and/or suppressed by the cigarette manufacturers, including Defendants herein and their co-conspirators, was concealed for the purposes of inducing the ROSS FREITAS to smoke and preventing him from quitting or reducing consumption of cigarettes. ROSS FREITAS was unaware of the extent of the danger of the Defendants' cigarette products, and that low tar, low nicotine, filtered, "natural," and/or "additive-free" cigarettes were just as dangerous as unfiltered and/or "regular" cigarettes. The knowledge and information concealed by the cigarette manufacturers, including the Defendants herein, who had superior knowledge regarding the health aspects of cigarettes than ROSS FREITAS.

247.    Defendants made false promises to Plaintiff, ROSS FREITAS, in the following ways:

    a.    Defendants assumed the responsibility to provide ROSS FREITAS, and the public, accurate and truthful information about their own products;

b. Defendants concealed and/or suppressed the aforementioned material facts about the dangers of cigarettes;

c. Defendants were under a duty to disclose material facts about the dangers of cigarettes to Plaintiff;

d. Defendants assumed the duty of disclosing material facts about the dangers of cigarettes through repeated public statements concerning tobacco and health, the need for more research, and the open question about disease causation;

e. Defendants knew they were concealing material facts about the dangers of cigarettes from Plaintiff;

f. Defendants intended to induce Plaintiff to smoke and become addicted to cigarettes;

g. Plaintiff was unaware of the dangerous and addictive nature of cigarettes and would not have begun or continued to smoke had she known the aforementioned concealed and/or suppressed information Defendants' possessed;

h. Plaintiff was unaware of the danger of Defendants' cigarettes, the addictive nature of Defendants' cigarettes, and that low tar, low nicotine, "light", filtered, "natural," and/or "additive-free" cigarettes were just as dangerous as unfiltered and "regular" cigarettes;

i. Plaintiff justifiably relied upon Defendants to disseminate the superior knowledge and information they possessed regarding the dangers of cigarettes;

j. The concealment and/or suppressed of material facts regarding the hazards of cigarettes caused Plaintiff to become addicted cigarettes, and also caused him to develop COPD and suffering a heart attack.

248.    Defendants' conduct was the actual and proximate or legal cause of ROSS FREITAS'S injuries. Plaintiff has sustained damages consisting of developing COPD and

suffering a heart attack, to incur significant medical expenses, and to endure enormous pain and suffering.

## Count V
## Civil Conspiracy
### (Against Philip Morris, R.J. Reynolds, RAI and SFNT)

249.    Plaintiff restates and incorporate herein the foregoing paragraphs of their Complaint.

250.    Defendants acted in concert to accomplish an unlawful objective for the purposes of harming Plaintiff, ROSS FREITAS  are not limited to the following:

   a. Defendants, along with other cigarette manufacturers, CTR, TIRC, TI, and with attorneys and law firms retained by Defendants, unlawfully agreed to conceal and/or omit, and did in fact conceal and/or omit, information regarding the health hazards of cigarettes and/or their addictive nature with the intention that smokers and the public would rely on this information to their detriment.

   b. Defendants agreed to execute their scheme by performing the abovementioned unlawful acts and/or by doing lawful acts by unlawful means;

   c. Defendants, along with other entities including TIRC, CTR, TI and persons including their in-house lawyers and outside retained counsel, entered into a conspiracy in 1953 to conceal the harms of smoking cigarettes;

251.    Defendants, through their executives, employees, agents, officers and representatives made numerous public statements from 1953 through 2000 directly denying the health hazards and addictive nature of smoking cigarettes.

   a. Marketing and/or advertising filters as safer or less hazardous to health than non-filtered cigarettes;

   b. Marketing and/or advertising low tar cigarettes as safer or less hazardous to health;

   c. Marketing and/or advertising lights and ultra-light cigarettes as safer or less

hazardous to health;

d.  Knowingly concealing from the public that filtered, low tar, lights, and ultra-lights cigarettes were no safer or even less hazardous than other cigarettes;

e.  Adding "onserts" to packages of cigarettes even after the United States government banned marketing on "light" and "ultra-light" cigarettes;

f.  Continuing to market and/or advertise lights, ultra lights, and low tar cigarettes under color brand name descriptors such as "GOLD" and "Silver" and informing smokers "pack will be changing, but your cigarette will stay the same" following the federal ban on the use of "lights," "mild," and "low" tar descriptors in 2010.

g.  Opposing, and continuing to oppose proposed FDA regulations to reduce or eliminate levels of nicotine in cigarettes;

h.  Continuing to market and prey upon children and teenagers who are not able to understand or appreciate the risks and dangers associated with cigarette smoking.

252.    Defendants' actions, as it relates to their acts in furtherance of their conspiracy as alleged in this complaint, continues through the present.

253.    Two or more of the cigarette manufacturers, including Defendants herein, by their aforementioned concerted actions, intended to accomplish, and did indeed accomplish, an unlawful objective of misleading and deceiving the public, for the purpose of harming Plaintiff.

254.    ROSS FREITAS relied, both directly and indirectly, on the Defendants' concealment and omission of such information to his detriment. ROSS FREITAS, during the course of his smoking history heard, some or all of these false and misleading statements, and/or similar statements made directly or indirectly by the Defendants' and their co-conspirators' believed some or all of the Defendants' and their co-conspirators' false and misleading

statements and relied to his detriment and smoked and/or continued to smoke cigarettes based on such false and misleading statements.

255.    The success of the conspiracy depended upon the concerted action of the cigarette manufacturers (in a so-called "gentleman's agreement"), for otherwise the revelation by one company of what it knew about the health consequences of smoking and/or the availability of a "safe" or "safer" cigarette and/or the addictive nature of the manufacturers' cigarette would have thwarted the conspiracy.

256.    Defendants' specifically PHILIP MORRIS , R.J. REYNOLDS, RAI and SFNT , their legal counsel, their trade organizations, and other cigarette manufacturers engaged in numerous overt acts in furtherance of the conspiracy. Such acts included, but were not limited to:

a.    A meeting between Philip Morris, R.J. Reynolds, and their co-conspirators in 1953 at the Plaza Hotel in New York City to form the Tobacco Institute Research Committee ("TIRC"), eventually renamed the Council for Tobacco Research ("CTR"), an organization which claimed its purpose was to promote "independent" research on cigarette dangers, but which instead was used by Philip Morris, R.J. Reynolds, and its co-conspirators to disseminate misleading information about the dangers of smoking;

b.    Meetings over the years of TIRC and its successor organization CTR, where the co-conspirators discussed and acted upon their above stated goals;

c.    TIRC-funded research studies, which avoided the issue of cancer and addiction, and instead focused on other matters, while giving the impression to the public that the "cancer question" was under "investigation";

d.    The subsequent creation of the Tobacco Institute, an organization formed for the purpose of providing misleading information concerning the dangers of cigarette use

to the media and others, of which Philip Morris, R.J. Reynolds, and their co-conspirators were members;

e.     The suppression of and refusal to publish various research studies carried out by co-conspirators which revealed smoking to be both harmful and addictive;

f.     The Tobacco Institute issued publications and news releases, made telephone calls, and contacted the media, government, and others suggesting the presentation of the "other side" of the "health controversy" about cigarettes, and urged the media to quote tobacco industry sources when reporting on scientific developments showing the dangers of cigarettes smoking. These suggestions were accompanied by references to the amount of advertising carried in the magazine or newspaper and threats that such advertising would be dropped if the magazine did not comply;

g.     The publication in 1954 by Philip Morris, R.J. Reynolds, and their co-conspirators, through TIRC, of "A Frank Statement to Cigarette Smokers." The "Frank Statement" promised the public that Philip Morris, R.J. Reynolds, and their co-conspirators would do research to reveal the true dangers of cigarettes smoking;

h.     Following the publication of " A Frank Statement to Cigarette Smokers" and for many decades thereafter, numerous public statements were made by Philip Morris, R.J. Reynolds, and their co-conspirators that falsely criticized scientific publications and reports that showed that cancer and other diseases were caused by cigarette smoking;

i.     A statement on April 14, 1954, by the TIRC in "A Scientific Perspective on the Cigarette Controversy" that its members had adopted "an interest in people's health as a basic responsibility, paramount to every other consideration in our business," and a promise on July 1, 1954, to share its research findings on smoking and disease with the public;

j.  Statements and publications by Clarence Cook Little, spokesman for TIRC, to the effect that scientific evidence showing the dangers of cigarette smoking were "not proven" or were "merely statistical." These statements included, but were not limited to, statements made in *Atlantic* magazine in 1957, which were made with an intent to deceive the public into believing cigarette smoking was safe;

k.  A December 16, 1957, press release from TIRC falsely stating that "[n]o substance has been found in tobacco smoke known to cause cancer in human beings";

l.  "Research Reports on Tobacco and Health," generated on behalf of the co-conspirators by the Tobacco Institute and published for many years, which falsely claimed that there was scientific doubt concerning the known health consequences of smoking. These releases reported on fringe medical theories of causes of cancer other than cigarettes, in order to assuage the public's fear regarding the deadly consequences of smoking cigarettes. These theories, as reported by the Tobacco Institute on behalf of Philip Morris, R.J. Reynolds, and their co-conspirators included, but were not limited to, that smoking lowers fatty substances in the lungs, that lung cancer is caused by a certain personality, and that emphysema is an outcome of childhood measles;

m.  The commentary in the Annual Reports put out by TIRC that uniformly challenged the hypothesis that smoking was linked to lung cancer and emphasized that data regarding smoking and health was controversial, contradictory, and inconclusive;

n.  A false statement on July 6, 1961, by Tobacco Institute President George Allen in a press release that "The tobacco industry itself is more interested than anyone else in finding out and making public the true facts about tobacco and health," and a further false statement that "research in recent years has produced findings that weaken rather than support the claim that smoking is a major contributor to lung cancer";

75

o.  A false statement on March 14, 1963, by Tobacco Institute President George Allen in a press release that "Scientific opinions differ widely. Many scientists say that more must be learned before it will be known whether any of the factors now under study, including smoking, has a role in causation of diseases such as lung cancer, and, if so, whether that role is direct or indirect, primary or incidental. In the opinion of these scientists, singling out tobacco as a major factor is not warranted by scientific knowledge";

p.  An internal memorandum dated January 29, 1964, from George Weissman (Vice President of Philip Morris) to Joseph Cullman 3rd (President of Philip Morris and on the executive committee of the Tobacco Institute) regarding the "Surgeon General's Report" wherein it states "we must in the near future provide some answers which will give smokers a psychological crutch and a self-rationale to continue smoking";

q.  An internal review of the Surgeon General's Report of 1964 by Helmut Wakeham, Vice President of Research and Development at Philip Morris, Inc., concluding that there was "little basis for disputing the findings [of the 1964 Surgeon General's Report] at this time";

r.  A confidential British American Tobacco document reporting on the company's 1964 visit with the heads of the major American tobacco companies, including Philip Morris and R.J. Reynolds, recounting the following concerning the influence of the lawyers in the conspiracy: "In consequence of the importance of the lawsuits, the main power in the smoking and health situation undoubtedly rests with the lawyers, and more particularly with the Policy Committee of lawyers. The members of this committee are – Henry Ramm (Reynolds Chairman) - Cy. Hetsko (A.T.Co.) - Add. Yeaman (Brown & Williamson) – Paul Smith (PM)[…]." The report concluded: "This

76

Committee is extremely powerful; it determines the high policy of the industry on <u>all</u> smoking and health matters- research and public relations matters, for example, as well as legal matters- and it reports directly to the Presidents.";

s.   A public statement issued by the Tobacco Institute on October 21, 1966, two years after issuance of the 1964 Surgeon General's Report, stating that the tobacco industry knew "of no valid scientific evidence demonstrating that either 'tar' or nicotine is responsible for any human illness";

t.   A statement on October 3, 1967, by Paul D. Smith, Vice President and General Counsel of Philip Morris, that "The truth of the matter is this: No one knows whether cigarette smoking causes any human disease or in any way impairs human health," and that "[n]obody has yet been able to find any ingredient as found in tobacco or smoke that causes human disease";

u.   In November 1967, at the direction of outside lawyers, the Tiderock Corporation, the Tobacco Institute's public relations firm, prepared an action plan titled "The Cigarette Controversy." The action plan proposed to influence public opinion by creating specific initiatives to re-open the "open question" cigarette controversy. The program called for the creation of a position paper for intra-industry use as well as one for distribution to the media and public. The plan included targeted categories for mailings such as the medical profession, scientists, communicators (press, radio, television), educators, top public figures, and 10,000 top corporate presidents. It also detailed the publication of magazine articles;

v.   A memorandum dated April 15, 1968, from William Kloepfer, Vice President of Public Relations for the Tobacco Institute to Earle Clements, President of the Tobacco Institute stating, "Our basic position in the cigarette controversy is subject to the

77

charge, and maybe subject to a finding, that we are making false or misleading statements to promote the sale of cigarettes";

w.   The publication of an article in 1968, paid for by co-conspirators, entitled "To Smoke or Not to Smoke – That is Still the Question," in *True* magazine, which was designed to appear as legitimate article by a genuine author. The article was in fact written by a sportswriter who was also employed by Hill and Knowlton, the public relations firm behind the creation of TIRC. This article deliberately misstated the known dangers of smoking;

x.   Notification by Philip Morris Senior Scientist Dr. Helmut Wakeham to Philip Morris senior management on January 10, 1969, that "[n]ow we have a study of the effect of smoking in pregnancy which supports previous conclusions that smoking mothers produce smaller babies," and that the medical field recognized that "smaller babies suffer detrimental effects all through life," including "lower intelligence test scores at age 10";

y.   A 1969 Brown & Williamson internal document which states "doubt is our product since it is the best means of competing with the "body of facts" that exists in the mind of the general public.  It is also the means of establishing a controversy.";

z.   A report on December 8, 1970, by Philip Morris researcher Dr. Helmut Wakeham to Philip Morris President Joseph Cullman III on the Council for Tobacco Research program, which was publicly described as a funding source for independent research on tobacco and health, stating: "It has been stated that CTR is a program to find out 'the truth about smoking and health.' What is truth to one is false to another. CTR and the Industry have publicly and frequently denied what others find as 'truth.' Let's face it. We are interested in evidence which we believe denies the allegation that cigarette

smoking causes disease.";

aa.    A false statement on January 3, 1971, by Joseph Cullman III, President of Philip Morris that "We do not believe that cigarettes are hazardous; we don't accept that. But we are working with the government, working very hard with the government, on various methods of ascertaining whether or not cigarettes can be found to be hazardous … I believe they have not been proved to be unsafe";

bb.    A false statement on January 3, 1971, by Joseph Cullman III, President of Philip Morris that "[I]t's true that babies born to women who smoke are smaller, but they are just as healthy as the babies born to women who do not smoke. Some women would prefer to have smaller babies";

cc.    A press release dated November 15, 1971, in which the Tobacco Institute falsely stated, in addressing whether smoking adversely affects the health of pregnant women, that "We just don't know, and only further research on smoking and all the other possible factors that may affect pregnancy will answer the question";

dd.    An internal memorandum dated April 14, 1972, from Claude Teague (Assistant Director of Research for R.J. Reynolds) that states  "happily for the tobacco industry, nicotine is both habituating and unique its variety of physiological actions, hence no other active material or combination of materials provides equivalent "satisfaction." The memo goes on to state that "we have deliberately played down the role of nicotine, hence the non-smoker has little or no knowledge of what satisfactions it may offer him, and no desire to try it.  Instead, we must convince him with wholly irrational reasons that he should try smoking, in the hope that he will for himself then discovery the real "satisfactions" obtainable.";

ee.    A 1972 memorandum to Horace Kornegay, president of the Tobacco Institute, stated

that for 20 years the industry had employed a single strategy to defend itself on three major fronts: litigation, politics, and public opinion. The author noted that "it has always been a holding strategy, consisting of "creating doubt about the health charge without actually denying it -- advocating the public's right to smoke, without actually urging them to take up the practice--encouraging objective scientific research as the only way to resolve the question of health hazard.";

ff.   An updated version of the Tobacco Institute's "The Cigarette Controversy," published in 1974, stating that a causal relationship between smokers and illness or death had not been established and that such claims were unproven;

gg.   A 1976 interview of James Bowling, Vice President of Philip Morris, wherein he stated "I wouldn't be in the business if I thought cigarettes were harmful to people. I think it is important that there be a lot of us around who are trying to keep the research honest and open. I think the real dishonesty is telling people things that are not so."

hh.   A 1976 interview of Helmut Wakeham, Vice President of Science and Technology at Philip Morris wherein he stated "If the company, as a whole, believed that cigarettes were really harmful, we would not be in the business. We are a very moralistic company. I think the management of Philip Morris is sincere in this position. I think there is a great deal of doubt as to whether or not cigarettes are harmful."

ii.   A pamphlet issued in 1978 by the Tobacco Institute, stating that "The flat assertion that smoking causes lung cancer and heart disease and that the case is proved is not supported by many of the world's leading scientists.";

jj.   Articles in *The Tobacco Observer*, circulated by the Tobacco Institute, perpetuating the industry's denials of causation and harm from smoking. One headline announced, "Smoke not harmful to average non-smoker" (October 1978). In the May 1976 issue,

one headline read "No Simple Answers; Research Disputes UPI"; and another stated, "no cause and effect relationship between cigarette smoking and pulmonary emphysema has been established";

kk.  A November 1978 CTR memorandum acknowledged the existence of an "ad hoc" committee, made up of representatives of legal, public relations, and research executives of the major tobacco companies, who were working together to plan the industry's response to the "smoking and health" issue. This same memorandum noted that trade organizations such as CTR have been used as a tobacco industry "shield" in response to increasing reports of smoking related disease since the 1950s.

ll.  A pamphlet published by the Tobacco Institute in 1979 titled "TOBACCO from seed to smoke amid controversy," stating falsely: "it has not been established that smoking causes any human disease";

mm. William L. Dunn, a Philip Morris scientist, wrote in a 1980 document titled "The Nicotine Receptor Program" that, despite the fact that the psychopharmacology of nicotine is "where the action is for those doing fundamental research on smoking," and where "most likely will come significant scientific developments profoundly influencing the industry, . . . it is where our attorneys least want us to be.    ";

nn.  A false statement by R.J. Reynolds Chairman and CEO Edward Horrigan in 1982 that "science to date after much research including over $100 million funded by our industry, indicates that no causal link [between smoking and human disease] has been shown," and that "there is absolutely no proof that cigarettes are addictive.";

oo.  A national advertising campaign undertaken by R. J. Reynolds in 1984, which asserted that "[S]tudies which conclude that smoking causes disease have regularly ignored significant evidence to the contrary.";

81

pp.  In 1984 R.J. Reynolds Chairman and CEO Edward Horrigan, as part of a panel discussion on the "Nightline" television program, stated that: (1) "It is not known whether cigarettes cause cancer,"; (2) "Despite all the research to date, there has been no causal link established [between smoking and emphysema]"; and (3) "As a matter of fact, there are studies that while we are accused of being associated with heart disease, there have been studies conducted over 10 years that would say, again, that science is still puzzled over these forces.";

qq.  A December 31, 1985, memorandum from Reynolds' outside counsel indicated that "[a]fter the 1964 Surgeon General's report came out, the Law Department influenced research objectives to a degree, because the lawyers did not want anyone performing research that would appear to acknowledge that cigarettes or cigarette smoke contained harmful constituents or posed a health problem.";

rr.  A 1985 publication issued by R.J. Reynolds, entitled "Of Cigarettes and Science," falsely stating that cigarettes do not cause heart disease, which was the subject of an F.T.C. charge of false advertising;

ss.  Statements to Congress by the executives of Philip Morris, R.J. Reynolds and their co-conspirators falsely denying the addictiveness and dangerousness of cigarettes. For example, in 1994 R.J. Reynolds' then Chairman and CEO, James Johnston testified that cigarettes and nicotine clearly do not meet the classic definitions of addiction, after R.J. Reynolds engaged in national media campaign to further mislead the public as to the addictiveness of cigarettes; and[6]

tt.  In 1994 the Tobacco industry released the previously confidential list of 600 cigarette

_____

[6] There are many other acts in furtherance of the conspiracy engaged in by Defendants. Plaintiff reserves the right at trial to introduce additional acts in furtherance of the conspiracy.

additives, making it easier to believe that the true horror of cigarettes lay in their myriad additives. Adults in the United States believe commonly that cigarette additives are primarily responsible for cigarettes' harmful aspects, and that natural or additive-free cigarettes are or may be less harmful than other brands.

257.    By knowingly and intentionally working together, Defendants, PHILIP MORRIS, R.J. REYNOLDS, RAI and SFNT, created a false and misleading "cigarette controversy" which was promulgated by trade organizations that Defendants herein were not only actively participating in and employees' were chairmen and members of, but also in fact helped financially fund and set up including the TI, TIRC, and CTR who internal, previously secret and concealed documents included the following statements discussing their conspiracy:

a.    "Our basic position in the cigarette controversy is subject to the charge, and may be subject to a finding, that we are making false or misleading statements to promote the sale of cigarettes" (Previously concealed from Tobacco Institute);

b.    For nearly 20 years, this industry has employed a single strategy to defend itself…brilliantly conceived and executed… a holding strategy… creating doubt about the health care without actually denying it" (Letter from Vice President of the Tobacco Institute Fred panzer);

c.    The most important type of story is that which casts doubt on the cause and effect theory of disease and smoking…Doubt is our product." (Previously concealed memo to the Tobacco Institute);

d.    Ann Browder, a representative from the Tobacco Institute appearing on WPLG in 1983 stating the following: "We don't know what causes the illness [cancer]… I don't think there is a causal relationship because cigarette smoking and any illness;"

e.    "CTR began as an organization called the Tobacco Research Counsel (TIRC). It was

set up as an industry "shield" in 1954 … [an attorney] feels that "special projects" are the best way that monies are spent. On these projects CTR has acted as a front." (Previously concealment meeting minutes from a CTR meeting held in New York in 1978 where Jim Bowling Senior Vice President of Corporate Affairs, Bob Seligman, Vice President of Research & Development, and Tom Osdene, Director of Research all from Philip Morris were in attendant along with [an attorney at an outside law firm])"

258.    Defendants' actions and statements as described above lead to a systemic culture in America regarding an alleged cigarette controversy, where people, including Mr. Freitas, were manipulated into believing cigarettes were safe and not deadly.

259.    Defendants' actions further directly lead to mass marketing of cigarettes in quantities we cannot even comprehend today that seeped into every household and family in America, including Mr. Freitas's.

260.    Asa direct and proximate result of Defendants' actions and contributions to the IT, TIRC, and CTR, the tobacco industry was able to create and sustain the largest conspiracy and deception this country has ever seen.

261.    But for Defendants' direct involvement, Mr. Freitas would not have bene exposed to the same degree or intensity of cigarette advertising or have been exposed to the alleged "controversy" regarding cigarettes as she was exposed to.

262.    But for Defendants' direct involvement, Mr. Freitas would not have began smoking, continued to smoke, become addicted to smoking cigarettes, or developed COPD or had a heart attack as a result of smoking cigarettes.

## Count VI
### Violations of Fla. Stat. § 672.314
### (Against All Defendants)

84

263.    Plaintiff restates and incorporate herein the foregoing paragraphs of their Complaint.

264.    Philip Morris, R.J. Reynolds, RAI, SFNT and WALMART have committed unfair and deceptive acts and practices in violation of Fla. Sta. § 672.314,  and regulations promulgated thereunder. These violations include, but are not limited to, Philip Morris', R.J. Reynolds', RAI's, SFNT's and WALMART' breach of the implied warranty of merchantability, in violation of Fla. Sta. § 672.314, in the following respects:

   a.    At all relevant times, Philip Morris, R.J. Reynolds, RAI, SFNT and WALMART engaged in the business of developing, manufacturing, testing, designing, advertising, marketing, packaging, selling, promoting, and distributing Marlboro Lights, and Natural American Spirit brand cigarettes and placing such cigarettes into the stream of commerce in Florida;

   b.    Marlboro Lights, and Natural American Spirit brand cigarettes were expected to, and did, reach Ross Freitas in substantially the same condition they were in when originally manufactured, distributed, and/or sold by Philip Morris, R.J. Reynolds, RAI, SFNT and WALMART;

   c.    Philip Morris, R.J. Reynolds, RAI, SFNT and WALMART, as the manufacturers, sellers, marketers, and/or distributors of Marlboro Lights, and Natural American Spirit brand cigarettes impliedly warranted that such cigarettes were merchantable and fit for the ordinary purposes for which they were intended;

   d.    Philip Morris, R.J. Reynolds, RAI, SFNT and WALMART breached this warranty because the Marlboro Lights, and Natural American Spirit brand cigarettes manufactured, sold, and distributed by Philip Morris, R.J. Reynolds, RAI, SFNT and WALMART to Ross Freitas and other members of the public were defective and

85

unreasonably dangerous;

e.  Such cigarettes were carcinogenic, addictive, and contained dangerous levels of tar, nicotine, and other dangerous substances. The foreseeable risks posed by such cigarettes could have been reduced or eliminated by Philip Morris', R.J. Reynolds', RAI's and SFNT's adoption of safer reasonable alternative designs that were technologically and commercially available and feasible;

f.  At all times relevant to this Complaint, Ross Freitas used and consumed the Marlboro Lights, and Natural American Spirit brand cigarettes manufactured, sold, and/or distributed by Philip Morris, R.J. Reynolds, RAI, SFNT and WALMART in the manner in which Philip Morris, R.J. Reynolds, RAI, SFNT and WALMART intended and expected such cigarettes to be used and suffered damages as a result.

265.  Philip Morris, R.J. Reynolds, RAI, and SFNT also violated Fla. Sta. § 672.314 by making false representations of material facts concerning the safety and addictiveness of their products, and thereby caused damages to Ross Freitas.

266.  Philip Morris, R.J. Reynolds RAI and SFNT also violated Fla. Sta. § 672.314 by engaging in a conspiracy with other tobacco companies and trade organizations to hide what they knew about the dangers and addictiveness of cigarettes, and thereby causing damages to Ross Freitas.

267.  Philip Morris, R.J. Reynolds, RAI, and SFNT  also violated Fla. Sta. § 672.314 by making false representations concerning the relative safety of their cigarettes, including by the use of misleading descriptors such as "Lights," "Low Tar," and "Lowered Tar and Nicotine," "Filtered," and other words indicating a "Filter,"; and "Natural", "Additive-Free" and "Organic", knowing that consumers interpreted these descriptors to mean that the cigarettes were a healthier option, and thereby caused damages to Ross Freitas.

268.     As a proximate result of Philip Morris', R.J. Reynolds', RAI's, SFNT's and WALMART's unfair and deceptive trade practices, Ross Freitas, pursuant to Fla. Sta. § 672.314, is entitled to recover the damages sought in this Complaint.

### *Prayer for Relief*

Plaintiff requests judgment against all Defendants for compensatory and multiple damages for all injuries and losses described above, including, but not limited to:

A)  Ross Freitas's conscious pain and suffering and his medical expenses;

B)  Ross Freitas's lost earnings;

C)  All recoverable costs of this action; all legally recoverable interest; and

D)  Any other relief the Court deems just and proper.

### ***DEMAND FOR JURY TRIAL***

The Plaintiff in the above styled cause herby demands a trial by jury of all the issues triable by right in this action. demand a trial by jury of all claims so triable.

Dated this <u>15</u> day  of <u>November</u>, 2024.

**SCHLESINGER LAW OFFICES, P.A.**
*Attorneys for Plaintiff*
1212 Southeast Third Avenue
Fort Lauderdale, FL 33316
Telephone: (954) 320-9507
Fax: (954) 779-7389

By:     *Jonathan R. Gdanski*
        Scott Schlesinger
        Florida Bar No.: 444952
        Jonathan Gdanski
        Florida Bar No.: 0032097
        Jeffrey Haberman
        Florida Bar No.:98522
        Tyler Owens
        Florida Bar No.:1032549